2006 UT 46

**In the Matter of the ESTATE OF S.T.T.**

**Darlene Uzelac, Plaintiff and Appellee,**

v.

**Darryl Thurgood, Defendant and Appellant.**

**No. 20040796.**

Supreme Court of Utah.

Aug. 25, 2006.

J. Bruce Reading, Salt Lake City, for plaintiff.

Jerrald D. Conder, Salt Lake City, for defendant.

On Certification from the Utah
Court of Appeals

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case comes before this court as the result of a visitation dispute between a child's maternal grandparents and her father. Following the unexpected death of the child's mother, the grandmother petitioned the district court for custody of the child. However, the district court awarded custody to the father. Although the court's custody order urged the father to allow future visitation between the child and her grandparents, the parties were unable to agree upon an acceptable visitation schedule. As a result, the grandmother filed a petition for visitation pursuant to Utah Code section 30–5–2 (Supp. 2005)(the Grandparent Visitation Statute). The district court granted the petition.

¶ 2 On appeal, the father asks this court to declare that the district court's application of the statute violated his fundamental rights under the United States Constitution to manage the care, control, and custody of his child. While the father limits his arguments to an as-applied challenge, his claims appear to also directly challenge the constitutionality of any court's authority to order grandparent visitation. Because the Grandparent Visitation Statute grants courts authority to order grandparent visitation, we must undertake a facial constitutional analysis of the statute. Accordingly, we analyze first whether the plain language of the statute is unconstitutional, and second whether the trial court applied the statute in a manner that unconstitutionally infringed upon the father's liberty interest in the care, custody, and control of his child. We hold that the statute is constitutional, both on its face and as applied in this case.

## BACKGROUND

¶ 3 Darryl and Shauna Thurgood were divorced in February 1994. In December 1995, following a brief period of reconciliation, Ms. Thurgood gave birth to their daughter (the child). The following March, Ms. Thurgood and her child moved in with Ms. Thurgood's parents, Darlene and Robert Uzelac, where they lived for the next three years. During that period, the child spent a substantial amount of time with her grandparents and interacted with them on a daily basis. When the child became old enough to attend preschool, one of her grandparents regularly picked her up from school and spent afternoons with her. The Uzelacs cared for the child during the week, took her camping on weekends, and vacationed with her.

¶ 4 The extent of the Uzelacs' involvement changed somewhat in February 1999, when Ms. Thurgood moved into her own home, taking the child with her. Thereafter, the grandmother continued to play a significant role in the child's life by babysitting the child several times each week and speaking to her on the phone almost daily. This ended just over a year later when Ms. Thurgood died unexpectedly after a short illness. As a result, Ms. Uzelac moved into the child's home to provide full-time care for the child.

¶ 5 Following Ms. Thurgood's death, Ms. Uzelac petitioned to be appointed as guardian and conservator of the child.[1] However, in June 2000, the district court awarded custody to the child's father, Mr. Thurgood, as the sole surviving natural parent. In its order, the district court stated that there "ought" to be future visitation between the child and her maternal grandparents with Mr. Thurgood's approval and under "reasonable and liberal circumstances," and the court admonished the parties "to cooperate to see that the child visits appropriately with her grandmother."

---

1. Ms. Uzelac was the only plaintiff before the district court. Mr. Uzelac never joined her as a party. However, to the extent that the time the child spends with Ms. Uzelac will also be spent with Mr. Uzelac, the district court's findings determined that it would be in the child's best interests to spend time with her maternal grandparents. Like the district court, we will refer to the grandparents where relevant, even though Ms. Uzelac is the only appellee.

¶ 6 Shortly thereafter, it became apparent that the parties could not work out a mutually acceptable visitation schedule. Mr. Thurgood first received custody in June 2000, but he did not allow any visitation between the child and the Uzelacs for five months. Thereafter, Mr. Thurgood granted Ms. Uzelac two visits in December 2000, one for the child's birthday and the other for a family Christmas party. The next visitation occurred in March 2001, when Mr. Thurgood allowed Ms. Uzelac to spend one hour with the child. Ms. Uzelac did not see the child again until July 2002, at which time she petitioned the court for visitation pursuant to the Grandparent Visitation Statute. In July 2002, the court granted Ms. Uzelac temporary visitation, pending a final resolution of this matter. Despite the court-ordered schedule for visitation on the first weekend of every month, Mr. Thurgood only allowed Ms. Uzelac to visit the child twice between July 2002 and January 2003. As a result, the district court ordered the father to allow Ms. Uzelac to make up for the lost visits by spending every other weekend with the child for an indefinite period of time. Subsequently, visitation took place every other weekend until December 2003, when the Utah Court of Appeals reversed the district court's order, holding that the district court had abused its discretion by ordering make-up visitation in excess of the visitation necessary to remedy the number of visits the father had prevented. *Thurgood v. Uzelac*, 2003 UT App 439, ¶¶ 14–15, 83 P.3d 398. In January 2004, Mr. Thurgood moved to Florida with the child and the district court ordered temporary telephonic visitation between the child and Ms. Uzelac. The last telephonic visitation on record occurred in February 2004.

¶ 7 During this protracted litigation, Mr. Thurgood challenged the constitutionality of the Grandparent Visitation Statute, complaining that it infringed upon his liberty interest in the care, custody, and control of his child. The district court held the statute was constitutional, therefore giving Ms. Uzelac standing and the court jurisdiction to proceed to the question of whether visitation was in the child's best interests. The court then ordered the parties to conduct discovery regarding whether visitation was in the best interests of the child.

¶ 8 As part of its discovery order, the court ordered the performance of a "visitation evaluation by a duly qualified evaluator." The parties stipulated to the appointment of Valerie Hale, Ph.D. Although Mr. Thurgood was invited to participate in the evaluation process, he declined to do so. Because Mr. Thurgood refused to participate, Dr. Hale was only able to conduct an informal evaluation that was "limited to an assessment of the nature of the relationship between [the child] and her maternal grandparent without further input from Mr. Thurgood." Dr. Hale conducted her evaluation by meeting with the child and the Uzelacs at the Uzelacs' home during one of the scheduled grandparent visitation periods.

¶ 9 Based on her evaluation, Dr. Hale made the following findings: (1) "[t]here is a great deal of physical affection between the grandparents and [the child]"; (2) "[b]oth grandparents were patient [and] able to set and maintain limits" with the child; (3) "[t]he child responded to her grandparents as loved and trusted care givers"; (4) the child "expressed her desire to spend more time with her grandparents"; and (5) the child talked about the time when she lived in her grandparents' home with her mother. Dr. Hale concluded that, as a result of the grandparents' role as primary caregivers, the child "demonstrated a strong emotional attachment to her grandparents" that was as strong as parent-child emotional attachments and that the loss of this attachment would devastate the child. In addition, Dr. Hale concluded that the child still had an emotional wound from her mother's death. Because Dr. Hale believed the child kept the memory of her mother alive through access to her grandparents, she concluded that a loss of the relationship with the Uzelacs would impede the child's ability to cope with her mother's death. Therefore, Dr. Hale recommended that it would be "in the best interests of the child to maintain a meaningful relationship with her maternal grandparents which is characterized by frequent and ongoing visitation with them."

¶ 10 A trial regarding whether Ms. Uzelac should be granted permanent visitation was held on July 28, 2004. At the trial, Dr. Hale testified regarding her findings and her evaluation report was admitted into evidence. Mr. Thurgood countered Dr. Hale's testimony with the testimony of Brad Drown, a licensed clinical social worker. Mr. Drown testified that visitation would not be appropriate at that time due to the animosity between Mr. Thurgood and the Uzelacs, as was evidenced by the ongoing dispute.

¶ 11 The district court rejected Mr. Drown's recommendation, determining instead that there is a "bond of love and affection between [the child] and both of her maternal grandparents." The court then concluded that the parental presumption had been rebutted and visitation would be in the child's best interests. Therefore, the court ordered visitation between Ms. Uzelac and her grandchild.

¶ 12 Mr. Thurgood appealed the district court's decision to the Utah Court of Appeals, claiming that the district court's application of the Grandparent Visitation Statute violated his constitutional rights. The court of appeals certified the case to this court. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(b) (2002).

## ANALYSIS

¶ 13 Parents have a constitutional right to manage "the care, custody and control of their children." *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The U.S. Supreme Court has recognized that this right is "perhaps the oldest of the fundamental liberty interests." *Id.* at 65, 120 S.Ct. 2054. This liberty interest encompasses parents' personal choices in family life beginning with their right to marry and conceive and extending to their right to control the education of their children and raise them according to the dictates of their religion. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (recognizing that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment); *Wisconsin v. Yoder,* 406 U.S. 205, 232–33, 92 S.Ct. 1526, 32

L.Ed.2d 15 (1972) (holding that compulsory high school attendance interfered with Amish parents' fundamental rights to raise their children according to the dictates of their religion); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (recognizing the "rights to conceive and raise one's children"); *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (holding that a parent's liberty interest extends to the choice of education and upbringing of children); *Meyer v. Nebraska,* 262 U.S. 390, 399–401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (holding that the right to "marry, establish a home and bring up children" is protected by the Due Process Clause of the Fourteenth Amendment and includes the parents' right to control the education of their children). In accordance with this right, parents are entitled to a presumption that they act in the best interests of their children, *see, e.g., Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions."), and their child-rearing decisions are therefore generally entitled to deference, *see Troxel,* 530 U.S. at 69, 120 S.Ct. 2054.

¶ 14 Notwithstanding the parental presumption, however, "the family itself is not beyond regulation." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The state as parens patriae has a "wide range" of authority that may ultimately limit parental autonomy in raising children. *Id.* at 167, 64 S.Ct. 438. The U.S. Supreme Court has long upheld the state's use of its parens patriae authority to protect children in many arenas; for example it has recognized a state's authority to mandate school attendance, *see Meyer,* 262 U.S. at 400, 43 S.Ct. 625 (acknowledging importance of education enforced in most states by compulsory education laws), regulate child labor, *see Sturges & Burn Mfg. Co. v. Beauchamp,* 231 U.S. 320, 325, 34 S.Ct. 60, 58 L.Ed. 245 (1913) (allowing states to prohibit youths from working in dangerous occupations), and protect children from abuse and neglect, *see Santosky,* 455 U.S. at 766–67, 102 S.Ct. 1388

(upholding state interest in "promoting the welfare of the child" through a parental termination proceeding as long as the state provides sufficient protection to parents to satisfy due process).

¶ 15 The state's power to protect the best interests of minor children also extends to divorce proceedings and custody determinations. *See Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (reversing a state court's decision to give a father custody based on the mother's interracial marriage and stating that "[t]he goal of granting custody based on the best interests of the child is indisputably a substantial governmental interest for purposes of the Equal Protection Clause"); *cf.* Utah Code Ann. § 30–3–5(5)(a) (Supp.2005) ("In determining parent-time rights of parents ... the court shall consider the best interest of the child."). In some cases, states have extended this authority to include the protection of relationships that children have formed with third parties. *See Campbell v. Campbell*, 896 P.2d 635, 643 (Utah Ct.App.1995) (recognizing the state has a legitimate interest "in fostering relationships between grandparents and their grandchildren"); *cf.* Utah Code Ann. § 30–3–5(5)(a) (requiring courts to consider the best interests of the child in determining the visitation rights of immediate family members). For example, many states, like Utah, have passed laws protecting the relationship between children and grandparents.[2]

¶ 16 Utah first statutorily recognized the importance of grandparent relationships in 1975 when the legislature amended Utah Code section 30–3–5, which dealt with orders concerning children in a divorce proceeding,

to address grandparent visitation. *Gribble v. Gribble*, 583 P.2d 64, 66 (Utah 1978) (citing Utah Code Ann. § 30–3–5 (1953)). The amended version of the statute instructed courts to consider "the welfare of the child" when granting grandparent visitation. Utah Code Ann. 30–3–5 (1953). The amendment reflected the "legislative intent to protect the relationships which affect the child whose parents are being divorced, and to be sensitive to the fact that relationships beyond those of parent-child may be important enough to protect vis-a-vis visitation." *Gribble*, 583 P.2d at 66. Two years later, in 1977, the Utah Legislature extended its recognition of grandparent visitation by adopting Utah Code sections 30–5–1 and –2, the first Utah statutes dealing exclusively with the visitation rights of grandparents. 1977 Utah Laws page no. 566. Specifically, section 30–5–2 provided, "The district court may grant grandparents reasonable rights of visitation to grandchildren, if it is in the best interest of the grandchildren." *Id.*

¶ 17 Since 1977, section 30–5–2 has been amended a number of times. Its current iteration grants grandparents standing and provides that Utah courts may grant visitation if the grandparents rebut the presumption that "a parent's decision with regard to grandparent visitation is in the grandchild's best interests." Utah Code Ann. § 30–5–2(2) (Supp.2005). The statute then lists a number of factors that are relevant to the court's determination of whether the presumption has been rebutted. *Id.* In particular, the statute favors grandparents whose children have been separated from their grandchildren by death, divorce, separation, or loss of custody by the child of the grandparents. *See id.* § 30–5–2(2)(c), (e), (f).

---

2. *See* Ala.Code § 30–3–4.1 (Supp.2005); Alaska Stat. § 25.20.065 (2004); Ariz.Rev.Stat. Ann. § 25–409 (Supp.2005); Ark.Code Ann. § 9–13–103 (2006); Colo.Rev.Stat. § 19–1–117 (2005); Conn. Gen.Stat. § 46b–59 (2005); Del.Code Ann. tit. 10, § 1031 (2006); Ga.Code Ann. § 19–7–3 (2006); Haw.Rev.Stat. § 571–46.3 (Supp.2005); Idaho Code Ann. § 32–719 (2006); 750 Ill. Comp. Stat. 5/607 (LexisNexis Supp.2006); Ind. Code Ann. § 31–17–5–1 (2006); Ky.Rev.Stat. Ann. § 405.021 (2006); Mich. Comp. Laws Serv. § 722.27b (2006); Minn.Stat. § 257C.08 (2004); Miss.Code Ann. § 93–16–3 (2004); Mo.Rev.Stat. § 452.402 (Supp.2005); Mont.Code Ann. § 40–9–102 (2005); Neb.Rev.Stat. § 43–1802 (2004); Nev.Rev.Stat. Ann. § 125C.050 (LexisNexis 2004); N.M. Stat. Ann. § 40–9–2 (LexisNexis 1999); N.C. Gen.Stat. § 5–13.2A (2005); N.D. Cent.Code § 14–09–05.1 (2004); 23 Pa. Stat. Ann. §§ 5311–5313 (West 2001); R.I. Gen. Laws §§ 15–5–24.1 to –24.3 (2003); S.D. Codified Laws § 25–4–52 (2006); Tenn.Code Ann. §§ 36–6–306 to –307 (2006); Tex. Fam.Code Ann. § 153.433 (Vernon Supp.2005); Vt. Stat. Ann. tit. 15, §§ 1011–1016 (2002); Wis. Stat. §§ 767.245, 880.155 (2003–04); Wyo. Stat. Ann. § 20–7–101 (2005).

¶ 18 The district court granted Ms. Uzelac visitation pursuant to this statute. While Mr. Thurgood argues that the district court's order was an unconstitutional application of the statute, his arguments are framed as a facial challenge in that he does not address any arguments unique to either the facts of his case or the district court's application of the statute. Rather, his argument suggests that courts can never constitutionally grant grandparent visitation over the objections of a fit custodial parent and thus the statute cannot be constitutionally applied under any circumstance. Moreover, the district court's authority to grant grandparent visitation is contingent upon the constitutional validity of the statute as a whole. Therefore, we begin our analysis of this case by addressing whether the statute unconstitutionally infringes upon a parent's right to the care, custody, and control of his or her children. Because we conclude that it does not, we then consider whether the statute was applied unconstitutionally in this case.

## I. UTAH'S GRANDPARENT VISITATION STATUTE IS CONSTITUTIONAL

### A. Troxel v. Granville

¶ 19 The only U.S. Supreme Court case addressing the federal constitutionality of grandparent visitation is *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In *Troxel*, the children's paternal grandparents petitioned for bimonthly visitation following the death of the children's father. *Id.* at 61, 120 S.Ct. 2054. The grandparents brought their petition pursuant to a Washington statute that allowed "any person" to petition the court for visitation rights "at any time" and authorized the court to order visitation if it would "serve the best interest of the child." *Id.* (quoting Wash. Rev.Code. § 26.10.160(3) (1994)). The children's mother did not oppose all visitation, but she sought to limit it to one short visit per month. *Id.* The trial court disagreed

with the mother's judgment and, over her objections, ordered visitation twice per month based on the "best interests of the children." *Id.* at 61–62, 120 S.Ct. 2054. The Washington Court of Appeals reversed the trial court's order, and the grandparents sought review from the Washington Supreme Court. *Id.* at 62, 120 S.Ct. 2054. The Washington Supreme Court granted the grandparents' petition and held that the statute was facially unconstitutional because it failed to require a "threshold showing of harm" before interfering with parental judgments and swept too broadly by allowing "any person" to petition the court at "any time," leaving the "best interest" standard as the only limiting factor. *Id.* at 63, 120 S.Ct. 2054. On certiorari, the U.S. Supreme Court affirmed the judgment of the Washington Supreme Court. *Id.*

¶ 20 A plurality of the Court held that, as applied, the Washington statute unconstitutionally infringed upon the mother's fundamental right to control the upbringing of her children, *id.* at 73, 120 S.Ct. 2054, because it failed to accord proper deference to the parental presumption,[3] *id.* at 68–69, 120 S.Ct. 2054. The grandparents did not allege or present evidence that their grandchildren's mother was unfit; therefore, the presumption that fit parents act in their children's best interests applied and the mother's decisions were entitled to deference. *Id.* Despite her right to the parental presumption, the trial court did not give any "special weight" to her decision regarding grandparent visitation. *Id.* at 69, 120 S.Ct. 2054. In fact, the trial court essentially applied the opposite presumption, assuming that grandparent visitation was in the children's best interests. *Id.* The trial judge specifically stated, "I think [visitation with the] [grandparents] would be in the best interest of the children and I haven't been shown it is not." *Id.* (first alteration in original). The trial judge then reminisced about the enjoyable summers he had spent with his own grandparents and expressed his hope that grandparent visita-

3. The plurality consisted of four justices. *Troxel v. Granville*, 530 U.S. 57, 60, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Two other justices concurred in the judgment, voting to uphold the Washington Supreme Court's facial invalidation of its own statute. *Id.* at 75–80, 120 S.Ct. 2054 (Sout-

er & Thomas, J., concurring in the judgment). The remaining three justices dissented. *See id.* at 80–91, 120 S.Ct. 2054 (Stevens, J., dissenting); *id.* at 91–93, 120 S.Ct. 2054 (Scalia, J., dissenting); *id.* at 93–102, 120 S.Ct. 2054 (Kennedy, J., dissenting).

tion would be as enjoyable an experience for the children in the case before him. *Id.* at 72, 120 S.Ct. 2054. This approach effectively required the mother to prove that her proposed visitation schedule would be in the best interests of her children rather than requiring the grandparents to prove that the children's best interests would be better served by their own, more generous visitation schedule. *Id.* at 69, 120 S.Ct. 2054.

¶ 21 The plurality's conclusion that the trial court did not give the proper weight to the mother's decisions was supported by the fact that the mother did not seek to deny all visitation and that the district court did not make adequate findings to support its decision. *Id.* 71–73, 120 S.Ct. 2054. The plurality deemed it important that the mother did not attempt to deny the grandparents all visitation, but merely wished to limit it beyond the visitation requests of the grandparents. *Id.* at 71, 120 S.Ct. 2054. Despite her willingness to offer visitation opportunities to the grandparents, the trial court did not defer to her proposed schedule or make any findings that the mother's proposed visitation schedule was unreasonable. *Id.* at 72, 120 S.Ct. 2054. Moreover, the trial court articulated only two formal findings to support its order to supercede the mother's decision: (1) that the grandparents were "part of a large, central, loving family . . . and [could] provide opportunities for the children in the areas of cousins and music," and (2) that "the children would be benefitted by spending quality time with [their grandparents]." *Id.* at 72, 120 S.Ct. 2054. The plurality believed that such meager findings indicated that the trial court's decision hinged on "a simple disagreement" between the trial judge and the mother regarding the children's best interests. *Id.* This was impermissible because the "Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72–73, 120 S.Ct. 2054. Therefore, based on the trial court's presumption that grandparent visitation was in the children's best interests and the trial court's meager findings, the plurality held that the trial court did not afford due weight to the mother's decision and thus applied the statute unconstitutionally. *Id.* at 73, 120 S.Ct. 2054.

¶ 22 Although the plurality limited its holding to the statute's unconstitutional application, it did criticize the statute as a whole. Specifically, the plurality stated the statute was "breathtakingly broad," essentially allowing "any person" to petition for visitation at "any time" and giving the court power to grant such a petition as long as it served the child's best interest. *Id.* at 67, 120 S.Ct. 2054. According to the plurality, this language "effectively permit[ted] any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id.* The plurality's censure did not end there. It also disapproved of the statute's failure to require that a court afford a parent's decision "any presumption of validity or any weight whatsoever," instead leaving the decision "solely in the hands of the judge." *Id.* The plurality recognized that this essentially meant that a Washington court could "disregard and overturn *any* decision by a fit custodial parent concerning visitation," *id.* (emphasis in original), which is exactly what it believed the trial court had done, *id.* at 72, 120 S.Ct. 2054.

¶ 23 The plurality recognized that most state court visitation adjudication occurs on a case-by-case basis and therefore declined to hold that all nonparental visitation statutes violate the Due Process Clause as a per se matter. *Id.* at 73, 120 S.Ct. 2054. However, the plurality's criticisms of the Washington statute's language and application provide guidelines concerning what a statute should include in order to comport with due process. Following *Troxel,* statutes allowing a court to award visitation over the wishes of a parent must presume that fit parents act in their children's best interests. *Id.* at 69–70, 120 S.Ct. 2054. Likewise, the plurality implied that statutes requiring a finding that the parent has unreasonably denied or limited visitation would be more likely to be upheld. *See id.* at 71–72, 120 S.Ct. 2054 (favorably citing to state statutes containing a requirement that visitation be unreasonably denied). Finally, given the plurality's criticisms of the district court's failure to make adequate fac-

tual findings, *id.* at 72, 120 S.Ct. 2054, statutes ought to provide guideposts to aid courts in making specific determinations regarding the rebuttal of the parental presumption. Statutes that follow these guidelines provide greater assurance that courts will allow the parent to make the decision in the first instance and accord "special weight" to the parent's decision when it is reviewed. *Id.* at 70, 120 S.Ct. 2054.

¶ 24 The plurality's decision also provides guidance regarding what *Troxel* and the Due Process Clause do not require. Although the plurality recognized that as a fit parent the mother was entitled to the parental presumption, the plurality did not say that a fit parent's decision regarding visitation was absolute; rather, the plurality clearly contemplated that the presumption might be rebutted. *See id.* at 69, 120 S.Ct. 2054. The plurality stated that the decision about whether to cultivate an intergenerational relationship "is for the parent to make in the first instance. And, if a fit parent's decision . . . becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 70, 120 S.Ct. 2054. Thus, the problem in *Troxel* was not the trial court's intervention, but its failure to give any deference to the mother's decision. *Id.* at 69, 120 S.Ct. 2054. Similarly, the plurality decision does not impose the requirement that the parental presumption be rebutted by a showing of harm to the child. Indeed, the plurality specifically refused to determine whether the Due Process Clause requires a showing of harm or potential harm to the child as a condition precedent to granting visitation. *Id.* at 73, 120 S.Ct. 2054 (noting the plurality did not consider whether nonparental visitation statutes must include a showing of harm or potential harm to the child as a condition precedent to granting visitation in order to satisfy due process).

¶ 25 In light of these federal constitutional standards, we now address whether Utah Code section 30–5–2 provides sufficient structural safeguards to protect the constitutional rights of parents to make decisions concerning the care, custody, and control of their children.

### B. Utah's Grandparent Visitation Statute

¶ 26 "[L]egislative enactments are endowed with a strong presumption of validity; and . . . they should not be declared unconstitutional if there is any reasonable basis upon which they can be found to come within the constitutional frame work [sic]." *Greaves v. State,* 528 P.2d 805, 806–07 (Utah 1974). Therefore, when analyzing the constitutionality of a statute, the court "presumes that the statute is valid" and "resolve[s] any reasonable doubts in favor of constitutionality." *State v. Lopes,* 1999 UT 24, ¶ 6, 980 P.2d 191. Moreover, we will "construe the statute to avoid interpretations that conflict with relevant constitutional mandates, so long as the resulting construction does not conflict with the reasonable or actual legislative purposes of the statute." *State v. Mohi,* 901 P.2d 991, 1009 (Utah 1995). With these principles in mind, we hold that Utah Code section 30–5–2 (Supp.2005) can be interpreted consistently with the principles announced in *Troxel.*[4]

---

4. This case presents this court with its first post-*Troxel* opportunity to address the constitutionality of Utah's Grandparent Visitation Statute. Utah courts have, however, considered whether prior versions of the statute were constitutional under pre-*Troxel* jurisprudence. For example, in *Campbell v. Campbell,* 896 P.2d 635 (Utah Ct. App.1995), the Utah Court of Appeals considered the constitutionality of a prior version of the Grandparent Visitation Statute, which provided, "The district court may grant grandparents and other immediate family members reasonable rights of visitation if it is in the best interests of the children." Utah Code Ann. § 30–5–2 (Supp. 1994). The court of appeals concluded the statute was constitutional because it was "narrowly tailored to require 'reasonable' periods of temporary visitation only if the court [found] visitation to be 'in the best interest of the children,' " and it placed the burden of proving best interests on the grandparents rather than presuming that visitation was in the children's best interests. *Campbell,* 896 P.2d at 642–43 (quoting Utah Code Ann. § 30–5–2 (Supp.1994)). Thus, the visitation statute was "rationally related to promoting the State's legitimate interest in fostering relationships between grandparents and their grandchildren." *Id.* at 643. The Grandparent Visitation Statute has since been narrowed significantly. *See* Utah Code Ann. § 30–5–2 (Supp. 2005).

¶ 27 First, the Grandparent Visitation Statute protects parental liberty interests by explicitly incorporating a presumption that parents act in the best interests of their children. Utah Code Ann. § 30–5–2(2) ("There is a rebuttable presumption that a parent's decision [concerning grandparent visitation] is in the grandchild's best interests."). Accordingly, courts must generally give deference to a parent's grandparent visitation decisions and may only override them where the petitioning grandparent rebuts the presumption. A grandparent meets this burden when the grandparent shows that there are special circumstances that permit the court to set aside the parent's decision even after the court has given it special weight. *See id.* We read the statute to require that a court must, as a threshold matter, specifically determine that the grandparent has met this burden in the process of considering whether the court should order visitation. The court's inquiry must acknowledge that, at all times, the burden of proof rests on the petitioner and not on the parent.

¶ 28 The Grandparent Visitation Statute does not specify a standard of proof by which the parental presumption must be rebutted. The degree of proof required in a particular type of proceeding has "traditionally been left to the judiciary to resolve." *Santosky v. Kramer,* 455 U.S. 745, 755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (internal quotation marks omitted). Because the parental presumption deals with parental liberty interests, and accordingly should be afforded great deference by the courts, we conclude that a clear and convincing standard of proof should apply to satisfy due process requirements. *See Santosky,* 455 U.S. at 769, 102 S.Ct. 1388 (mandating the application of at least a clear and convincing standard in parental rights termination cases). Therefore, a grandparent petitioning the court for visitation under the Grandparent Visitation Statute must clearly and convincingly rebut the parental presumption.[5]

¶ 29 In addition to incorporating the parental presumption, Utah's Grandparent Visitation Statute contains a second structural component to prevent judgments based on mere disagreement between the judge and the parent by listing several relevant factors that may justify setting a parent's decision aside. These factors are: (1) whether the petitioner is a "fit and proper person"; (2) whether visitation with the grandchild has been "denied or unreasonably limited"; (3) whether the parent is "unfit or incompetent"; (4) whether the petitioner has "acted as the grandchild's custodian or caregiver" or has a "substantial relationship with the grandchild" the loss of which is "likely to cause harm to the grandchild"; (5) whether the petitioner's child (the parent of the grandchild) "has died or become a non-custodial parent"; (6) whether the petitioner's child has been "missing for an extended period of time"; and (7) whether "visitation is in the best interest of the grandchild." Utah Code Ann. § 30–5–2(2)(a)–(g). These factors can be grouped into three categories, which we will discuss below.

¶ 30 The first category generally addresses situations where a family has been divided by some turn of fate—death, divorce, loss of custody, a missing person, or a declaration that a parent is unfit or incompetent. The statute recognizes that when a family unit has been touched by these events a situation may arise where the child's interests differ from those of the parent. This is particularly true where the direct family line between grandparents and grandchildren has been severed, leaving the "in-law" relationship as the only remaining adult connection. *Id.* § 30–5–2(2)(c), (e), (f). Recognizing the potential for conflict in the relationship between the parent and the "in-law" and the resulting potential for interference with the grandparent-grandchild relationship, the statute pro-

---

5. Our requirement that the grandparents must rebut the presumption by clear and convincing evidence is consistent with prior versions of section 30–5–2. The 1998 version of section 30–5–2 provided that in order for a court to override a parent's visitation decision, the court had to find "the petitioner has, by clear and convincing evidence, rebutted the presumption that the parent's decision to refuse or limit visitation with the grandchild was reasonable." Utah Code Ann. § 30–5–2(2)(e) (1998). The clear and convincing requirement was removed from the statute in 2000. *See* Utah Code Ann. § 30–5–2 (2000).

vides an avenue for grandparents and grandchildren to maintain their relationship.[6]

¶ 31 The second group of statutory factors encompasses situations where the state has an interest in protecting the child from harm. Thus, a court may grant grandparents visitation if the grandparents can clearly and convincingly show they share a "substantial relationship" with the grandchild and the "loss or cessation of that relationship is likely to cause harm to the grandchild." *Id.* § 30–5–2(2)(d). The state's interest may also extend to situations where the child's parent has "denied or unreasonably limited" visitation, *id.* § 30–5–2(2)(b), because of the increased probability that the parent is not acting in the child's best interests.

¶ 32 The third category of statutory factors may be more accurately categorized as necessary threshold findings. These are findings that a court must make in order to grant visitation. For example, a court cannot order visitation if the petitioning grandparent is not a "fit and proper person to have visitation with the grandchild." *Id.* § 30–5–2(2)(a). Likewise, a court cannot order visitation unless it is in the best interests of the child. *See id.* § 30–5–2(2)(g). This holds true even if the petitioner has satisfied other statutory factors.

■■■ ¶ 33 We recognize that the statute describes "best interests" and grandparent fitness as relevant factors to the determination of whether the parental presumption has been rebutted. *Id.* § 30–5–2(2)(g). However, a judge could not rely solely on these factors in determining whether the parental presumption has been rebutted and still comport with due process. *See Troxel,* 530 U.S. at 72–73, 120 S.Ct. 2054 ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."). Allowing these factors alone to rebut the parental presumption would come too close to allowing a judge to supercede a parent's decisions based solely on a disagreement between the parent and the judge. Thus, while a grandparent must be fit to receive court-ordered visitation, we do not believe a grandparent's fitness, standing alone, would ever properly serve as a reason to override the parent's decision. Rather, it is only one of many factors that a court can consider in determining whether the circumstances allow it to intervene in the parent's decision-making process. Moreover, in order for the statute to adhere to constitutional requirements, we read the statute to require that the parental presumption be rebutted by clear and convincing evidence before a court orders visitation based on the child's best interests. This distinction is not readily apparent from the plain language of the statute, but it is necessary to sufficiently protect parental rights. We recognize, of course, that the factual findings that support other statutory factors, such as whether the loss of a substantial grandparent relationship will affirmatively harm the child, will often overlap with facts relevant to the ultimate determination of whether grandparent visitation is in the child's best interests.

¶ 34 While the statute lists several means by which a grandparent can rebut the paren-

6. Prior to 1992, the only grandparents eligible for court-ordered visitation under the Grandparent Visitation Statute were those grandparents "whose child, who is the parent of the grandchildren, is dead, or ... is divorced or legally separated from the other parent of the grandchildren." *Campbell,* 896 P.2d at 640 n. 9 (citing Utah Code Ann. § 30–5–1(2) (1989)). The current version of the Grandparent Visitation Statute does not incorporate this as a requirement, but rather includes it as one of several factors a court may consider when addressing a grandparent's petition for visitation. However, we note that it will be extremely difficult, if not impossible, for a grandparent to rebut the parental presumption where a family unit is intact because few, if any, of the statutory factors will apply. *See Campbell,* 896 P.2d at 640 n. 9 ("[W]e note that the state has a stronger argument for court intervention to protect the extended family when the nuclear family has been dissolved." (citation and internal quotation marks omitted)). Moreover, intact family units do not generally present the same emotional tensions as those that arise where the familial connections have been severed by an unfortunate twist of fate that has left only a strained in-law relationship in its wake. While it is true that parents in an intact family unit might unreasonably deny visitation to their own parents, the statute does not appear to be directed to such situations, but rather to those, such as the case before us, where an in-law has unreasonably denied visitation to the parents of his or her former spouse.

tal presumption, the presumption is most clearly rebutted when the court finds the existence of several relevant factors, such as in this case. Here, the court found that (1) Ms. Thurgood, the grandparent's child, had died; (2) the grandparents had a substantial relationship with the child, due in large part to a prior caretaking relationship, and the loss of the grandparent-grandchild relationship would harm the child; (3) the grandmother was fit; and (4) Mr. Thurgood had unreasonably limited or denied visitation.

¶ 35 We therefore hold that the Grandparent Visitation Statute is not unconstitutional under *Troxel.* The statute expressly incorporates the parental presumption, thereby ensuring that courts give "special weight" to the decisions of fit parents. Moreover, it provides guidance to courts in determining whether the petitioning grandparents have established circumstances under which the courts can, nevertheless, supercede the parent's decision.

¶ 36 Our holding that the statute is constitutional does not suggest the statute is flawless. We acknowledge that the statute is confusing and, consequently, provides very little guidance to a district judge trying to resolve a grandparent visitation dispute.[7] However, it is not our role to repair drafting defects that do not render a statute unconstitutional. This task falls to the legislature. Accordingly, we suggest, and indeed encourage, that our state legislature clarify the statute to provide more guidance to courts confronted with grandparent visitation issues. We hope that our decision in this case will assist the legislature in that undertaking.

¶ 37 Having determined that the Grandparent Visitation Statute is constitutional, we now turn to whether the trial court's application of the statute violated the liberty interests of Mr. Thurgood.

## II. AS APPLIED, THE GRANDPARENT VISITATION STATUTE DOES NOT INFRINGE UPON MR. THURGOOD'S LIBERTY INTERESTS

 ¶ 38 To determine whether the statute survives an as-applied challenge, we review the decision of the lower court to determine whether it meets the standards established by *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). "Constitutional challenges to statutes present questions of law, which we review for correctness." *Provo City Corp. v. Thompson,* 2004 UT 14, ¶ 5, 86 P.3d 735. For the district court's application to be constitutional, the grandparents must have clearly and convincingly rebutted the presumption favoring Mr. Thurgood's decision regarding grandparent visitation, and the district court must have found that grandparent visitation was in the child's best interests. Moreover, this determination must be accompanied by sufficient findings of fact to justify state interference. We hold that the district court constitutionally applied the statute.

¶ 39 As required by *Troxel,* 530 U.S. at 70, 120 S.Ct. 2054, the district court gave special weight to Mr. Thurgood's decisions. Before ordering visitation, the district court placed the burden of proof on the grandparents to rebut the presumption that Mr. Thurgood's visitation decision was in the best interests of the child. In determining whether the grandparents rebutted this presumption, the district court closely followed the structure

---

7. This opinion has already addressed some of the flaws with this statute by clarifying the way in which some of the factors must be treated to satisfy constitutional requirements. *See supra* ¶¶ 29–34. For example, we specified that a grandparent's fitness is a threshold finding and that a court cannot rely on best interests alone and still comport with due process. *Supra* ¶¶ 32–33. However, our construction of the statute does not fully clarify the manner in which it should be applied. For example, the statute lists several "relevant" factors a court may consider in determining whether the parental presumption has been rebutted, including (1) whether the grandparent is fit, (2) whether visitation has been

"denied or unreasonably limited", (3) whether "the parent is unfit", (4) whether the grandparent has acted as the child's caregiver or "otherwise has had a substantial relationship with the grandchild", (5) whether grandparent visitation is in the grandchild's best interests, and (6) whether the grandparent's child who is the parent of the grandchild has died, lost custody, or disappeared. Utah Code Ann. § 30–5–2(2). Although we have attempted to categorize these factors and have provided some instructions regarding how they should be applied, the statute still does not provide a district court with much guidance regarding how the factors ought to be weighed or applied.

established by the relevant factors listed in the statute.

¶ 40 The district court first looked to the structure of the family. Specifically, the court noted that this was the second time that the courts had been asked to intervene in the affairs of this family, stating "[t]he two parents of [the child] 'invited' the intervention of this court into the issue of custody and visitation, in the first instance, by divorcing in the courts of the State of Utah, thus necessitating a custody and visitation order." (Supp.2005).[8] Moreover, consistent with Utah Code section 30–5–2(2)(e), the district court noted that Ms. Uzelac's daughter, Ms. Thurgood, had died.

¶ 41 The district court also found that visitation between the child and the grandparents had been unreasonably limited or denied. When Mr. Thurgood first received custody in June 2000, he did not allow visitation for five months. After this five month period, he granted Ms. Uzelac two visits, one for the child's birthday and the other for a family Christmas party. The next visitation did not occur until March 2001, and it only lasted for one hour. Thereafter, Mr. Thurgood did not allow visitation or telephone calls until July 2002, despite repeated attempts by the Uzelacs to contact the child. After the judge ordered visitation in July 2002, Mr. Thurgood only allowed Ms. Uzelac to see the child twice between July 2002 and January 2003, when the district court issued a second visitation order. Following that order, Ms. Uzelac saw the child every other weekend throughout 2003 until Mr. Thurgood and the child moved to Florida in January 2004. Mr. Thurgood terminated all phone contact between the Uzelacs and the child one month later. Based on these findings, there was sufficient evidence for the district court to determine that visitation had been "denied or unreasonably limited," in satisfaction of one of the named statutory factors. Utah Code Ann. § 30–5–2(2)(b).

¶ 42 Finally, the court considered the "substantial relationship" between the child and her grandparents, concluding that the loss of this relationship would be harmful to the child. *Cf. id.* § 30–5–2(2)(d). The mother and the child lived with the Uzelacs, and the Uzelacs took care of the child on a daily basis throughout most of the child's first four years of life. Mr. and Ms. Uzelac picked the child up from school, took her camping on the weekends, and traveled with her. After the child's mother died, Ms. Uzelac lived with the child until Mr. Thurgood received custody. Moreover, the district court's conclusion that the child and the Uzelacs shared a substantial relationship was largely based on an expert's evaluation of the relationship between the child and the Uzelacs. The evaluation found that the child responded to her grandparents as "loved and trusted care givers," and that there was a "great deal of physical affection" between the child and the Uzelacs. The evaluation noted that during the evaluator's visit, the child reminisced about living in the grandparent's home with her mother and "expressed [a] desire to spend more time with her grandparents." The evaluator concluded that (1) the child demonstrated an "emotional attachment to her grandparents [that] was as strong as [that] seen between parents and children"; (2) the attachment could be explained by the grandparents' role as primary caregivers; (3) the loss of her mother remained a deep emotional wound for the child that had not been resolved; (4) the child kept the memory of her mother alive through her relationship with her grandparents; (5) the child would be unable to work through the loss of her mother without frequent access to her grandparents; and (6) the loss of contact with the Uzelacs would be devastating and cause the child to suffer. The evaluator therefore recommended that it would be in the best interests of the child to maintain a meaningful, ongoing relationship with the Uzelacs. The trial court agreed with these findings and found the presumption had been rebutted.

¶ 43 We agree that the evidence presented to the district judge clearly and convincingly rebutted the parental presumption, thereby permitting the court to override Mr. Thur-

8. We note that visitation and custody rights were not ordered in the divorce decree as the parties were divorced before the child was born. How- ever, the divorce necessitated the court's intervention after the child's birth by setting forth custody, visitation, and child support orders.

good's decision even after giving it special weight. We also agree with the district court's finding that grandparent visitation was in the child's best interests [9] due to the child's attachment to her grandparents and the potential harmful ramifications of severing this relationship. Therefore, the district court did not abuse its discretion when it ordered grandparent visitation in this case.

## CONCLUSION

¶ 44 The Grandparent Visitation Statute is consistent with the constitutional framework established in *Troxel v. Granville* and is therefore valid. Moreover, we find that the evidence presented below clearly and convincingly rebutted the parental presumption incorporated in the statute. As a result, the district court acted within its discretion when it superceded Mr. Thurgood's decision by ordering grandparent visitation based on the child's best interests. We therefore affirm.

¶ 45 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.

---

9. Although the Grandparent Visitation Statute does not define "best interests," the district courts of this state have extensive experience in applying this standard, particularly in the family dissolution context. In addition, there are statutes addressing best interests in other contexts that provide guidance. For example, Utah Code section 30–3–34 (Supp.2005) establishes fifteen factors a district court may consider to determine best interests of the child in the context of parental visitation after divorce. The factors that the court may consider in determining whether more or less parent time should be awarded under Utah Code section 30–3–34(2) are:

(a) parent-time would endanger the child's physical health or significantly impair the child's emotional development; (b) the distance between the residency of the child and the noncustodial parent; (c) a substantiated or unfounded allegation of child abuse has been made; (d) the lack of demonstrated parenting skills without safeguards to ensure the child's well-being during parent-time; (e) the financial inability of the noncustodial parent to provide adequate food and shelter for the child during periods of parent-time; (f) the preference of the child if the court determines the child to be of sufficient maturity; (g) the incarceration of the noncustodial parent in a county jail, secure youth corrections facility, or an adult corrections facility; (h) shared interests between the child and the noncustodial parent; (i) the involvement of the noncustodial parent in the school, community, religious, or other related activities of the child; (j) the availability of the noncustodial parent to care for the child when the custodial parent is unavailable to do so because of work or other circumstances; (k) a substantial and chronic pattern of missing, canceling, or denying regularly scheduled parent-time; (*l*) the minimal duration of and lack of significant bonding in the parents' relationship prior to the conception of the child; (m) the parent-time schedule of siblings; (n) the lack of reasonable alternatives to the needs of a nursing child; and (o) any other criteria the court determines relevant to the best interests of the child.