2007 UT 20

**Keri Lynne JONES, Plaintiff and Appellee,**

v.

**Cheryl Pike BARLOW, Defendant and Appellant.**

**Nos. 20040932, 20041031.**

Supreme Court of Utah.

Feb. 16, 2007.

Kathryn D. Kendell, San Francisco, CA, and Lauren R. Barros, Salt Lake City, for plaintiff.

Frank D. Mylar, Midvale, for defendant.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Defendant Cheryl Barlow asks this court to overturn the district court's order granting Barlow's former domestic partner, Keri Jones, visitation of Barlow's daughter. Because Jones has no biological or legal relationship with the child, she has no statutory standing to seek visitation. The district court, however, granted standing under the common law doctrine of in loco parentis. We must now decide whether Utah courts have

recognized, or should adopt, a common law doctrine granting standing for domestic partners of fit legal parents [1] to seek visitation of children for whom they had acted as parents.

¶ 2 We hold that the doctrine of in loco parentis, as recognized by the courts of this state, does not independently grant standing to seek visitation after the in loco parentis relationship has ended. Although this court recognized the right of stepparents to seek visitation in *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978), standing in that case arose out of an interpretation of statutory law granting such rights, not from an independent common law source. We decline to extend the common law doctrine of in loco parentis to create standing where it does not arise out of statute. We accordingly overturn the trial court's grant of visitation rights and hold that the common law doctrine of in loco parentis does not independently grant standing to seek visitation against the wishes of a fit legal parent.

## BACKGROUND

¶ 3 Cheryl Pike Barlow and Keri Lynne Jones began a romantic relationship, and in time, they moved in together. They ultimately traveled to Vermont, where they entered into a civil union.

¶ 4 In November 2000, around the time they made their decision to enter into a civil union, Barlow and Jones decided to have a child together. They planned that Barlow would be artificially inseminated and bear the child and that Jones would be artificially inseminated and bear a second child at a later date. Jones and Barlow selected a sperm donor who shared both of their characteristics and began the artificial insemination process. Barlow conceived in February 2001. During the pregnancy, Jones participated in prenatal care with Barlow and her physician.

¶ 5 On October 4, 2001, Barlow gave birth to a baby girl (the "child"). The birth certificate listed the child's surname as "Jones Barlow." For the first two years of her life,

both Barlow and Jones cared for the child. And in May 2002, the parties obtained an order from the Third District Court designating Jones and Barlow as co-guardians of the child.

¶ 6 Jones and Barlow ended their relationship around October 2003, soon after the child's second birthday. Subsequently, Barlow and the child moved to a separate residence, and Barlow eventually ended all contact between Jones and the child. Barlow also petitioned the district court for an order removing Jones as the child's co-guardian. Jones objected, but the district court granted the petition.

¶ 7 In December 2003, Jones brought suit in district court seeking a "[d]ecree of custody and visitation," claiming that she had standing under the common law doctrine of in loco parentis. The district court found that the doctrine of in loco parentis could confer standing and ordered that the proceedings be bifurcated. First, the parties would participate in an evidentiary hearing to assess whether Jones stood in loco parentis to the child. If the court found that Jones established the elements of in loco parentis, then the court would proceed with a best interests of the child analysis to determine visitation and custody.

¶ 8 At the conclusion of the first phase of trial, the district court held that Jones was in loco parentis to the child and thus had standing to argue that visitation was in the child's best interest. The district court limited the second phase of the trial to issues of visitation and child support after finding that Utah's adoption statutes precluded a consideration of custody. Following the conclusion of the second phase of trial, the district court found that continued contact with Jones would be in the child's best interest and ordered visitation. In addition, the court ordered Jones to provide financial support to the child.

¶ 9 Barlow appeals the district court's decision.[2] She presents five arguments: (1) the

---

[1.] Because biological and adoptive parents enjoy identical rights under the law, our use of the term "legal parent" throughout this opinion refers equally to both classes of parents.

[2.] We note that the docket number for this case, 20040932, was originally assigned to a string of interlocutory appeals filed with the Utah Court of Appeals before the entry of final judgment by the

trial court lacks jurisdiction in this case because the in loco parentis doctrine does not grant Jones standing to seek visitation; (2) the trial court's application of the in loco parentis doctrine violates Barlow's constitutional rights; (3) the visitation order violates Barlow's right to privacy; (4) Jones was never truly in loco parentis to the child; and (5) Jones' claims are barred by res judicata. Because we hold that Jones lacks standing, we reverse the trial court's order and decline to reach the merits of the remaining arguments.

## STANDARD OF REVIEW

¶ 10 In reviewing questions of common law standing, this court recognizes three possible standards of review. Determinations of the legal requirements for standing are reviewed for correctness. *Wash. County Water Conservancy Dist. v. Morgan*, 2003 UT 58, ¶ 18, 82 P.3d 1125. However, we give deference to the district court on factual determinations that bear upon the question of standing. *Id.* (citing *Kearns–Tribune Corp. v. Wilkinson*, 946 P.2d 372, 373 (Utah 1997)). Finally, we give minimal discretion to the district court in its application of the facts to the law. *Id.*

¶ 11 Because we confine our review to the district court's interpretation of the doctrine of in loco parentis and do not address its findings of fact or application of those facts to the law, the appropriate standard of review is correctness. We therefore grant no discretion to the district court.

## ANALYSIS

¶ 12 "[S]tanding is a jurisdictional requirement that must be satisfied" before a court may entertain a controversy between two parties. *Wash. County Water Conservancy Dist. v. Morgan*, 2003 UT 58, ¶ 6 n. 2, 82 P.3d 1125; *accord Harris v. Springville City*, 712 P.2d 188, 190 (Utah 1986) ("[L]ack of standing is jurisdictional."); *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983)

("[T]he moving party must have standing to invoke the jurisdiction of the court."). Under the traditional test for standing, "the interests of the parties must be adverse" and "the parties seeking relief must have a legally protectible interest in the controversy." *Jenkins*, 675 P.2d at 1148. A party may assert an interest that is legally protectible under either statute or the common law. *See Morgan*, 2003 UT 58, ¶ 17, 82 P.3d 1125. Recognizing that no Utah statute confers a right to seek visitation of the child, Jones bases her claim of a legally protectible right on the common law doctrine of in loco parentis.

¶ 13 The doctrine of in loco parentis is applied when someone who is not a legal parent nevertheless assumes the role of a parent in a child's life. *Gribble v. Gribble*, 583 P.2d 64, 66 (Utah 1978) ("The term 'in loco parentis' means in the place of a parent . . . ."); *Black's Law Dictionary* 803 (8th ed. 2004) ("Of, relating to, or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent."). An individual attains in loco parentis status by assuming the "status and obligations of a parent without formal adoption." *Gribble*, 583 P.2d at 66; *accord Rockwood v. Rockwood*, 65 Utah 261, 236 P. 457, 459 (1925). While an individual stands in loco parentis to a child, he or she has the "same rights, duties, and liabilities as a parent." *Sparks v. Hinckley*, 78 Utah 502, 5 P.2d 570, 571 (1931); *accord Gribble*, 583 P.2d at 66; *McDonald v. Texas Employers' Ins. Ass'n*, 267 S.W. 1074, 1076 (Tex.App. 1924) ("All such are said to stand in loco parentis, and, as long as the relation exists, the rights and duties with reference to the child are the same as those of the natural parent.").

¶ 14 The central question now presented to us is whether the in loco parentis doctrine contemplates perpetuating these parent-like rights and obligations after a legal parent has ended the in loco parentis relationship.

district court. A second docket number, 20041031, was assigned after Barlow filed a direct appeal from the final judgment. On December 17, 2004, the court of appeals certified this consolidated case number to the Utah Supreme

Court. Although this case number was originally assigned to the interlocutory appeals, we decide this case as an appeal from a final judgment and deem all unresolved interlocutory appeals moot under this decision.

Because at common law all rights and obligations end with the termination of the in loco parentis relationship, and because the doctrine in no way abrogates a parent's right to terminate such a relationship, we conclude that Jones lacks standing to seek visitation. And we decline to expand the in loco parentis doctrine to permanently diminish parental rights.

## I. THE IN LOCO PARENTIS DOCTRINE DOES NOT CONFER STANDING TO SEEK VISITATION AFTER THE PARENT–LIKE RELATIONSHIP HAS ENDED

¶ 15 Unlike the relationship arising from adoption, the in loco parentis relationship is temporary in nature. 59 Am. Jur.2d *Parent and Child* § 9 (2002); *Babb v. Matlock*, 340 Ark. 263, 9 S.W.3d 508, 510 (2000). In *Rockwood v. Rockwood*, 65 Utah 261, 236 P. 457 (1925), we endorsed the common law principle that where an individual enters into an in loco parentis relationship with a child, "the reciprocal rights, duties, and obligations of parent and child continue as long as such relation continues." *Id.* at 459; *accord* 59 Am.Jur.2d *Parent and Child* § 9 (2002) ("Once the person alleged to be in loco parentis no longer discharges all the duties incident to the parental relationship, the person is no longer in loco parentis."). Thus, the termination of the in loco parentis relationship also terminates the corresponding parent-like rights and responsibilities. 59 Am.Jur.2d *Parent and Child* § 9 (2002); *State v. Randall S. (In re Interest of Destiny S.)*, 263 Neb.255, 639 N.W.2d 400, 406 (2002).

¶ 16 Because it is clear that Barlow effectively ended the in loco parentis relationship when she moved to another residence and refused to allow Jones to interact with the child, the only question that remains is whether such an act by a legal parent qualifies as a valid termination of an in loco parentis relationship under the common law. Stated differently, the question is whether a legal parent may terminate the in loco parentis status by removing the child from the relationship with the surrogate parent or whether the in loco parentis doctrine allows

the surrogate parent to extend the relationship against the legal parent's will.

¶ 17 Before addressing the question of how an in loco parentis relationship may be terminated, we first correct a misstatement this court has made as to the status of the common law on this issue. It is universally recognized that, "[u]nlike natural and adoptive parenthood, the status of being in loco parentis is temporary; it *may* be abrogated at will either by the surrogate parent or by the child." 59 Am.Jur.2d *Parent and Child* § 9 (2002) (emphasis added). In *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978), we misconstrued this principle when we asserted that "[t]he common law concerning termination of the [in] loco parentis status is that *only* the surrogate parent or the child is able to terminate the status at will." *Id.* at 67 (emphasis added). This assertion that the common law recognized disavowal by either the surrogate parent or the child as the exclusive method of dissolving an in loco parentis relationship was incorrect.

¶ 18 When we review the authorities cited by this court in *Gribble*, we find no support for the proposition that only the surrogate parent or the child may terminate the in loco parentis relationship. In support of that proposition, the *Gribble* court, 583 P.2d at 67 n. 13, cited two cases: the Washington Supreme Court decision of *Taylor v. Taylor*, 58 Wash.2d 510, 364 P.2d 444 (1961), and the South Carolina decision of *Chestnut v. Chestnut*, 247 S.C. 332, 147 S.E.2d 269 (1966). Both of these cases involved attempts by men who stood in loco parentis to a child to avoid child support upon divorce or separation from their wives. *Taylor*, 364 P.2d at 444–46; *Chestnut*, 147 S.E.2d at 270. In declaring that these men could avoid a support obligation, both courts directly quoted the following statement from the Iowa Supreme Court as representing the accepted common law:

One important qualification is that one merely standing in the place of a parent may abandon the burdens attendant upon such status at any time. In *McDonald v. Texas Employers' Insurance Association* it is said: "... the status of one in loco parentis is temporary, and may be abro-

gated at will by either the person thus standing in loco parentis or by the child." To the same effect is this language from *In re McCardle's Estate* [95 Colo. 250, 35 P.2d 850 (1934)]: "It (loco parentis) is not, as argued, to be likened to that of adoption. The one is temporary in character, the other permanent and abiding."
*State ex rel. Gilman v. Bacon,* 249 Iowa 1233, 91 N.W.2d 395, 399 (1958) (citations omitted), *quoted in Taylor,* 364 P.2d at 445–46; *Chestnut,* 147 S.E.2d at 270.

¶ 19 That the surrogate parent is in no way bound by the obligations of the in loco parentis relationship does not support the somewhat contrary conclusion that the doctrine entitles the surrogate parent to unilaterally extend the rights pertaining to such a relationship. In fact, there is nothing in the authorities we cited in *Gribble* justifying the conclusion that the in loco parentis status may be terminated by *only* the surrogate parent or the child.

¶ 20 Our research has failed to uncover a single instance where a court has endorsed the proposition that the inherent power of the surrogate parent or the child to terminate the relationship is exclusive in nature. Quite the opposite, cases recognizing that the relationship may be abrogated at will by either party emphasize the transitory nature of the relationship, rather than the *Gribble* formulation of a relationship that is essentially permanent at the option of the surrogate parent. *See Harmon v. Dep't of Soc. & Health Servs.,* 134 Wash.2d 523, 951 P.2d 770, 775 (1998) ("At common law the status of one standing in loco parentis is voluntary and temporary and may be abrogated at will by either the person standing in loco parentis or . . . the child."); *In re Agnes P.,* 110 N.M. 768, 800 P.2d 202, 205 (N.M.Ct.App.1990) ("Furthermore, an in loco parentis status is temporary and may be abrogated at will by either the child or the surrogate parent."); *McDonald v. Texas Employers' Ins. Ass'n,*

267 S.W. 1074, 1076 (Tex.App.1924) ("[T]he relation existing between an adopting parent and the child is permanent, continuing, and cannot be abrogated by the parent; whilst the status of one in loco parentis is temporary, and may be abrogated at will by either the person thus standing in loco parentis or by the child."). In fact, a New Mexico appellate court that cited this proposition found that nothing within the in loco parentis doctrine prohibited the state from terminating the relationship against the objection of the surrogate parents. *Agnes P.,* 800 P.2d at 205. The court held that the surrogate parents were not entitled to termination hearings because they did not have the same due process rights as legal parents. *Id.*

¶ 21 In short, the fact that the in loco parentis status could be terminated by the surrogate parent or by the child does not suggest any limitation or restriction on the rights of a fit legal parent to terminate a surrogate parent's relationship with his or her child. We thus conclude that our statement in *Gribble* regarding termination of the in loco parentis status, insofar as it restricted the authority to terminate the relationship to either the surrogate parent or the child, was incorrect as a statement of the historical common law rule.

¶ 22 Indeed, there is no principle within the in loco parentis doctrine that purports to abridge a fit legal parent's right to govern her children's associations. The in loco parentis status is "temporary by definition and ceases on withdrawal of consent by the legal parent." *Carvin v. Britain (In re Parentage of L.B.),* 155 Wash.2d 679, 122 P.3d 161, 168 n.7 (2005).[3] In other words, a legal parent may freely terminate the in loco parentis status by removing her child from the relationship, thereby extinguishing all parent-like rights and responsibilities vested in the former surrogate parent.

---

3. The Washington Supreme Court has recognized that the in loco parentis doctrine is temporary in nature and does not extend permanent rights akin to those held by actual parents. *L.B.,* 122 P.3d at 168 n. 7; *Luby v. Da Silva (In re Custody of Brown),* 153 Wash.2d 646, 105 P.3d 991, 994 (2005) ("[N]o Washington case recog-

nizes that nonparents are guaranteed the fundamental rights of parents under the doctrine of in loco parentis."). However, the court has chosen to "adapt [their] common law" to recognize a "de facto parent" doctrine which does confer rights equal to that of a legal parent. *L.B.,* 122 P.3d at 176–77.

¶ 23 Other courts have recognized that the temporary nature of the in loco parentis status militates against using the doctrine to grant continual parent-like rights after the legal parent has terminated the in loco parentis relationship. When confronted with a situation where a former partner asserted in loco parentis standing to seek visitation of a child after the natural parent unilaterally removed the child from the relationship, the Texas Court of Appeals found that

> [o]nce [the biological parent] and the child moved out, however, any possible claim [the surrogate parent] may have had for standing in loco parentis ended. The common law relationship is temporary and ends when the child is no longer under the care of the person in loco parentis.

*Coons–Andersen v. Andersen,* 104 S.W.3d 630, 635–36 (Tex.App.2003). Indeed, the Texas court described "the very cornerstone of the doctrine" of in loco parentis as the "central common feature [that] the person deemed to be standing in loco parentis had actual care and custody of a child in a parent's absence." *Id.* at 636. Thus, the assignment of permanent rights is repugnant to one of the defining features of the in loco parentis doctrine—its temporary status.

¶ 24 This temporary status is reinforced by the fact that the surrogate parent may arbitrarily cast the relationship aside at any time and thus terminate all parent-like obligations and rights. 67A C.J.S. *Parent and Child* § 348 (2002); *Taylor v. Taylor,* 58 Wash.2d 510, 364 P.2d 444, 445 (1961). It would be a perverse doctrine of law that left a legal parent unable to enforce support obligations against a surrogate parent's will because of the temporary status of the in loco parentis relationship but allowed a surrogate parent to extend her parent-like rights against the legal parent's objections for as long as she saw fit. Under such a distorted legal regime, the parent-like rights and responsibilities are permanent and abiding for as long as the surrogate parent wants them to be, yet transitory and fleeting when the legal parent seeks to enforce a parental obligation against the surrogate parent.[4] Such an inequitable result, which would prioritize the rights of the surrogate parent over the needs of the child, demonstrates that the in loco parentis doctrine does not contemplate a perpetual grant of rights and is, in fact, ill-suited to convey such rights.

¶ 25 Despite the common law principle that the in loco parentis doctrine is temporary and does not convey rights that survive the termination of the parent-like relationship, Jones asserts that Utah cases have conferred standing to seek visitation upon those who had stood in loco parentis to a child. A close examination of these cases, however, reveals that this court has never granted standing to seek visitation solely on the basis of this common law doctrine.

¶ 26 In *Gribble,* 583 P.2d at 66, this court based a stepparent's standing to seek visitation upon an interpretation of a Utah divorce statute, which states in part that "[v]isitation rights of parents, grandparents and other relatives shall take into consideration the welfare of the child." Utah Code Ann. § 30–3–5 (1953) (current version at Utah Code Ann. § 30–3–5(5)(a) (Supp.2006)). We read this phrase to "indicate[ ] the legislative intent to protect the relationships which affect the child whose parents are being divorced" and reasoned that an individual who "stand[s] in the relationship of parent, grandparent, or other relative" had standing under the statute to seek visitation. *Gribble,* 583 P.2d at 66. Although we used the in loco parentis doctrine as an interpretive tool to guide the inquiry as to who stands in one of these relationships, the ultimate source of standing was the statute itself—not the common law doctrine of in loco parentis.[5] *Id.* at

---

4. Although hypothetically the surrogate parent would be burdened by parental responsibilities for as long as he or she chose to extend parental rights, this does not change the fact that the power of choice remains entirely the prerogative of the surrogate parent. The legal parent would have no right to exclude the surrogate parent from the child's life, while neither the legal parent nor the child would have the right to enforce a support obligation once the surrogate parent has opted to cast the relationship aside.

5. We make no determination whether the *Gribble* interpretation of the prior version of Utah Code section 30–3–5 applies to the slightly modified wording contained in the current version of the code. *See* Utah Code Ann. § 30–3–5(5)(a) (Supp. 2006).

68 ("If appellant is in loco parentis, he should be considered a parent for purposes of Sec. 30–3–5."); *State ex rel. J.W.F.*, 799 P.2d 710, 715 n. 5 (Utah 1990) (finding that the court in *Gribble* "was interpreting Utah Code Ann. § 30–3–5 (1953)"). In this case, however, Jones does not rely upon any interpretation of statutory law. Rather, she relies solely upon the common law for standing. We therefore conclude that *Gribble* is inapplicable.

¶ 27 Equally unavailing to Jones is our holding in *J.W.F.*, 799 P.2d 710. In that case, a wife left her husband and subsequently bore a child fathered by another man. *Id.* at 712. Soon after, both the natural father and mother abandoned the child, and the state of Utah eventually terminated their parental rights. *Id.* Although the husband was still technically married to the wife, he did not learn of the child's existence until the child was nine months old. *Id.* Upon learning that he had a stepson, the husband petitioned for custody. *Id.* In conferring standing to the stepfather to seek custody, this court relied upon two rationales. First, we reasoned that this court had granted to stepparents standing to be heard on matters of custody. *Id.* at 716. Second, because the Utah legislature had imposed a support obligation upon stepparents for the duration of the marriage to the legal parent, we reasoned that this support obligation was sufficient to confer standing. *Id.* Neither rationale applies to Jones.

¶ 28 We explicitly did not rely upon the in loco parentis doctrine in *J.W.F.* because no such relationship existed in that case. *Id.* at 715 n. 5. In a footnote, however, we opined that perhaps other types of relationships could give rise to standing: "[I]t is conceivable that persons who are not related by blood or marriage, although not presumptively entitled to standing, could show that they had a relationship with the child that would warrant a grant of standing. We have no such situation before us today." *Id.* at 715 n. 4. As confessed dicta, this musing on the potential outcome of a hypothetical situation is not

binding upon this court. And perhaps this court would have been less inclined to entertain the notion of throwing open the gate to participation in a child's life if a fit legal parent had been involved, as in the present case.[6]

¶ 29 In summary, traditional common law principles counsel that the in loco parentis status is of temporary duration and may be terminated "[o]nce the person alleged to be in loco parentis no longer discharges all duties incident to the parental relationship." *Hamilton v. Foster*, 260 Neb. 887, 620 N.W.2d 103, 116 (2000). While Jones may have stood in loco parentis to the child during the time she was actually living with her and providing for her care, her in loco parentis status terminated when Barlow and the child moved out. According to common law principles, Jones does not have standing to extend the in loco parentis relationship against Barlow's wishes. Finally, Jones is not proceeding under the divorce statutes as did the stepparent in *Gribble*. We conclude that recognizing a legally protectible right under the rubric of in loco parentis would be "an unwarranted expansion of an otherwise well-established common law doctrine," *Coons–Andersen*, 104 S.W.3d at 636, and therefore decline to do so.

## II. WE DECLINE TO JUDICIALLY CREATE VISITATION RIGHTS BY ADOPTING A "DE FACTO PARENT" OR "PSYCHOLOGICAL PARENT" DOCTRINE

¶ 30 What Jones essentially asks us to do is recognize a new judicial doctrine in Utah that creates in a third party the right to seek visitation with a child in contexts outside those recognized by this state's domestic relation laws. Whatever label is applied to such a doctrine, it is clear that the common law concept of in loco parentis does not reach so far. Were we to recognize such a right in this case, it would have to be under one of several judicially created doctrines that have been used recently in other jurisdictions to confer visitation rights upon

---

6. We do not have before us, and we do not decide, whether a person who is or once stood in loco parentis to a child has standing to seek visitation or custody in the absence of a fit legal parent.

someone other than a parent. Most prominent among these other doctrines are those labeled "psychological parent," or "de facto parent." [7] *E.g., Carvin v. Britain (In re Parentage of L.B.)*, 155 Wash.2d 679, 122 P.3d 161, 163 (2005); *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 *passim* (2000); *E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886, 891 (1999). Rather than creating temporary rights and obligations that last as long as a surrogate parent stands in the place of an actual parent, these doctrines create permanent and abiding rights similar to those of an actual parent. *See L.B.*, 122 P.3d at 177 ("We thus hold that henceforth in Washington, a *de facto* parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise."); *V.C.*, 748 A.2d at 552 ("[A] psychological parent-child relationship ... may not be unilaterally terminated after the relationship between the adults ends.").

¶ 31 We decline to craft such a doctrine. First, adopting a de facto parent doctrine fails to provide an identifiable jurisdictional test that may be easily and uniformly applied in all cases. A de facto parent rule for standing, which rests upon ambiguous and fact-intensive inquiries into the surrogate parent's relationship with a child and the natural parent's intent in allowing or fostering such a relationship, does not fulfill the traditional gate-keeping function of rules of standing. Under such a doctrine, a party could try the merits of her case under the guise of an inquiry into standing, unduly burdening legal parents with litigation. We agree with the Supreme Court of Vermont that

> jurisdiction should not rest upon a test that in effect would examine the merits of visitation or custody petitions on a case-by-case basis. In reality, such a fact-based test would not be a threshold jurisdictional test, but rather would require a full-blown evidentiary hearing in most cases. Thus,

any such test would not prevent parents from having to defend themselves against the merits of petitions brought by a potentially wide range of third parties claiming a parent-like relationship with their child. *Titchenal v. Dexter*, 166 Vt. 373, 693 A.2d 682, 687–88 (1997).

¶ 32 In addition to providing an unsure jurisdictional threshold, adopting a de facto parent doctrine would exceed the proper bounds of the judiciary. The essential questions presented to the court in this case are some of the most intimate and important that our society faces. In the abstract, we are asked to define perhaps the most influential and personal relationship ever experienced— that of parent and child. In particular, we are asked to determine the future upbringing of a child and Jones' continued participation in that process.

¶ 33 Faced with these questions, and without the benefit of binding applicable law, Jones asks us to craft a judicial doctrine with broad social implications that attempts to adjudicate between competing policy considerations. On the one hand, we recognize that mutual bonds of affection can be formed between a child and an adult who does not fit within the traditional definition of a parent and that such a relationship has the potential to enrich the lives of both the surrogate parent and the child. However, in carving out a permanent role in the child's life for a surrogate parent, this court would necessarily subtract from the legal parent's right to direct the upbringing of her child and expose the child to inevitable conflict between the surrogate and the natural parents. Such a doctrine raises concerns that a legal parent could be deprived of a portion of her parental rights on the basis of "elusive factual determinations" as to whether she intended to relinquish those rights to a third party.[8] *Van v. Zahorik*, 227 Mich.App. 90, 575 N.W.2d 566, 570 (1997) (internal quotation marks omitted).

---

**7.** For a more detailed description of these doctrines, see Chief Justice Durham's dissent. *Infra* at ¶¶ 63–90.

**8.** Chief Justice Durham's dissent proposes the adoption of a modified version of the test to determine de facto parent status in which "a

third party claiming de facto parent status [must] establish by clear and convincing evidence that (1) the legal parent intended to create a permanent parent-child relationship between the third party and the child, and (2) an actual parent-child relationship was formed." *Infra* ¶ 68.

¶ 34 Although principled arguments can be made for the adoption of a de facto parent doctrine, such arguments are ultimately based upon policy preferences, rather than established common law. In such situations, we find the Michigan Supreme Court to be persuasive when it stated:

As a general rule, making social policy is a job for the Legislature, not the courts. This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's.

*Van v. Zahorik,* 460 Mich. 320, 597 N.W.2d 15, 18 (1999) (citations and internal quotation marks omitted); *see also State ex rel. Skeen v. Ogden Rapid Transit Co.,* 38 Utah 242, 112 P. 120, 125 (1910) (holding that exceeding the judiciary's own authority results in an undue usurpation of legislative powers).

¶ 35 Jones asks this court to exercise the wisdom of Solomon by adopting a de facto parent doctrine based upon our weighing of the competing policies at play. Although this court is routinely called upon to make difficult decisions as to what the law is, or even to fill the interstices of jurisprudence, in this case we are asked to create law from whole cloth where it currently does not exist. While the distinction between applying the law to unique situations and engaging in legislation is not always clear, by asking us to recognize a new class of parents, Jones invites this court to overstep its bounds and invade the purview of the legislature.

¶ 36 Courts are ill-suited for such ventures. Courts are unable to fully investigate the ramifications of social policies and cannot gauge or build the public consensus necessary to effectively implement them. Unlike the legislature, which may craft a comprehensive scheme for resolving future cases and then may repeal or amend it at any time should it prove unworkable, courts are not agile in developing social policy. If we miscalculate in legislating social policy, the harm may not be corrected until an appropriate case wends its way through the system and arrives before us once again—a process that may take years or even decades. Moreover, our attempt to correct a prior misstep could then damage the legal system's reliance upon the principle of stare decisis.

¶ 37 In addition to our reticence to assume an essentially legislative role, the creation of a de facto parent rule absent any precedent in Utah law would be an unwarranted expansion of the common law. We agree with the dissent that the common law is a "dynamic and growing thing." 15A Am.Jur.2d *Common Law* § 2 (2000); *see infra* ¶¶ 60–61. However, "the common law decisionmaking process is inherently incremental in nature; the very 'genius of the common law is that it proceeds empirically and gradually, testing the ground at every step' ... [and] calls for devising a rule that does not stray too far from the existing regime." *PM Group Life Ins. Co. v. W. Growers Assurance Trust,* 953 F.2d 543, 547 (9th Cir.1992) (quoting R. Aldisert, *Logic for Lawyers* 8 (1989)); *accord McClure v. Life Ins. Co. of N. Am.,* 84 F.3d 1129, 1135 (9th Cir.1996); *Falcone v. Middlesex County Med. Soc.,* 34 N.J. 582, 170 A.2d 791, 799 (1961) ("The persistent movement of the common law towards satisfying the needs of the times is soundly marked by gradualness. Its step by step process affords the light of continual experience to guide its future course."). Creating a de facto parent doctrine for Utah would be a dramatic expansion of the common law thereby defying the principle of incremental development.

¶ 38 Such a divergence from Utah's established common law is also inappropriate because there are no broadly accepted principles to guide us to a de facto parent doctrine. We agree that "our courts should avoid effecting change in the common law of this State when there is no substantial body of agreement that such change is necessary and when it is patent that such change can be better effected by legislative action." *Duhan v. Milanowski,* 75 Misc.2d 1078, 348 N.Y.S.2d 696, 701 (Sup.Ct.1973). As we have noted, this case presents us with conflicting policies upon which there is no broad consensus. There are simply no bedrock principles upon

which to construct a doctrine creating visitation rights for nonparents.

¶ 39 To the extent that there are guiding principles within the common law, they militate against a common law right of visitation for nonparents. It is a fundamental tenet of our common law that "the only persons having any actually vested interest in the custody of a child cognizable by the law are the parents." *Wilson v. Family Servs. Div.*, 554 P.2d 227, 229 (Utah 1976). Other relatives of a child merely have "some dormant or inchoate right or interest in the custody and welfare of children" that matures only upon the death or termination of the rights of the parents.[9] *Id.* at 230–31. Finally, courts may not make a "best interests" inquiry into nonparent custody of a child absent a determination that the legal parents are unfit. *In re J.P.*, 648 P.2d 1364, 1368–69 (Utah 1982); *see also A.N. v. M.I.W. (In re Adoption of P.N.)*, 2006 UT 64, ¶ 15, 148 P.3d 927.[10] Although our precedent in this area involves custody rather than visitation, the common law nevertheless evidences a strong presumption that parental rights

shall not be disturbed absent a determination that the legal parents are unfit.[11] This presumption is in direct contradiction to a de facto parent doctrine, which interferes with a parent's right to direct the upbringing of her child. Thus, adopting such a doctrine would not be a natural development of the common law, but rather a legislative act in derogation of recognized common law principles.

¶ 40 Finally, the de facto parent doctrine conflicts with Utah statutory law. The legislature has defined the manner in which a parent-child relationship is established. The mother-child relationship is established by

(a) the woman's having given birth to the child, except as otherwise provided in Part 8, Gestational Agreement;

(b) an adjudication of the woman's maternity;

(c) adoption of the child by the woman; or

(d) an adjudication confirming the woman as a parent of a child born to a gestational mother if the agreement was valid

---

9. We note that the language quoted by the dissent from *State ex rel. J.W.F.*, 799 P.2d 710, 714 (Utah 1990), that nonparents need not "stand as a total stranger to the child" makes sense in the context of these inchoate rights. *See infra* ¶ 51. Taken as a whole the passage reads:

> It may be that no one has the same rights toward a child as his or her parents. *See Wilson v. Family Services Div., Region Two*, 554 P.2d 227, 230 (Utah 1976). However, the fact that a person is not a child's natural or legal parent does not mean that he or she must stand as a total stranger to the child where custody is concerned.

*J.W.F.*, 799 P.2d at 714. Thus *J.W.F.* does not stand for the proposition that nonparents may have common law standing to assert visitation rights against fit parents. In fact, this decision affirms that "no one has the same rights toward a child as his or her parents." *Id.* This passage merely confirms the proposition asserted in *Wilson* that other relatives may have standing to seek custody in the absence of a fit parent. This is born out by the facts of *J.W.F.*, where a stepfather was granted standing to seek custody only when both of the biological parents had their parental rights terminated. *Id.* at 712, 716.

10. In the case of *P.N.*, the child's biological mother relinquished her parental rights and gave custody of the child to a couple seeking to adopt him. 2006 UT 64, ¶ 3, 148 P.3d 927. The dis-

trict court later found the mother's relinquishment to be ineffective. The mother and biological father both opposed the adoption and sought custody of the child, who, at the time, was in the custody of the prospective adoptive parents. *Id.* ¶¶ 3–4, 5. The trial court found no basis for terminating the parental rights of either of the biological parents and therefore dismissed the petition for adoption. *Id.* ¶ 8. It then scheduled a "best interests trial" and awarded custody of the child to the prospective adoptive parents. *Id.* ¶ 9. We reversed, holding that it was error for the court to award custody of P.N. to legal strangers in the absence of an order terminating the parental rights of his fit natural parents. *Id.* ¶ 15. We therefore remanded the case for a determination of custody as between the biological parents. *Id.* ¶ 18. Although the case involved custody rather than visitation and was based upon an analysis of the statute governing adoption, Utah Code Ann. § 78–30–4.16 (Supp. 2006), it is nevertheless illustrative of the proposition that a child's fit legal parent is presumed to act in his best interests. Therefore, absent a statutory basis for doing so, it is improper for a court to second-guess the decision of the fit legal parents by conducting a "best interests" analysis.

11. We note that Utah Code sections 30–3–5(4)(a) and 30–5–2, discussed below, stand as statutorily created exceptions to this general rule because they grant standing to seek visitation rights even against the objections of fit parents.

under Part 8, Gestational Agreement, or is enforceable under other law.

Utah Code Ann. § 78–45g–201 (Supp.2006). The legislature has also designated which nonparents have standing to seek visitation of a child. Statutes grant standing to an immediate family member to seek visitation in the context of a divorce, *id.* § 30–3–5(4)(a), and to grandparents in certain circumstances, *id.* § 30–5–2.

¶ 41 Because the legislature has spoken in this area, we are reluctant to adopt a common law doctrine that implicitly controverts this statutory scheme. The addition of a new class of de facto parents would conflict with the legislature's apparently exhaustive list of who is considered a mother under the law. Also, granting visitation rights to de facto parents contradicts the legislature's ·narrow grant of standing to certain immediate family members to petition for visitation. As the dissent notes, the legislature has not explicitly addressed the standing of a surrogate parent. *See infra* ¶ 46. The grant of standing to immediate family members under certain well-defined circumstances, however, creates the negative implication that all other categories of nonparents are prohibited from seeking visitation rights. Otherwise, the standing requirement would not serve its function as a jurisdictional bar to litigation because every unmentioned class of nonparent could attempt to establish visitation rights under the common law. We decline to expand the common law into an area occupied by statute so as to contradict the apparent legislative intent.

¶ 42 In sum, we decline to adopt a de facto parent doctrine because it would be an improper usurpation of legislative authority and would contradict both common law principles and Utah statutory law. Although we have no reason to doubt the sincerity of Jones' parental feelings for the child, we are unwilling to craft a doctrine which would abrogate a portion of Barlow's parental rights.

## CONCLUSION

¶ 43 We hold that the district court erred in granting Jones standing to seek visitation. The common law doctrine of in loco parentis does not convey perpetual rights that survive the termination of the parent-like relationship. And we decline to create such perpetual rights by adopting a doctrine similar to that of "psychological parent" or "de facto parent." We therefore reverse the district court order granting visitation and requiring Jones to pay child support.

¶ 44 Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

DURHAM, Chief Justice, dissenting:

¶ 45 I respectfully dissent. The facts of this case mirror a typical divorce—two parents separated and are quarreling over child visitation and custody. In this case, however, the parents are both women, only one of whom is the biological parent of the child they mutually decided to bring into their relationship. Although this situation is becoming more and more common, it presents this court with a question of first impression: Does the nonbiological mother have standing to petition for visitation with the child despite the objections of the biological mother? I would hold that she does, provided that she and the child have, with the consent of the biological parent, created a de facto parent-child relationship.

## I. THE LEGISLATURE HAS NOT ADDRESSED A SURROGATE PARENT'S STANDING

¶ 46 I disagree with the majority's assertion that the "legislature has spoken in this area." *Supra* ¶ 41. The majority specifically references Utah Code section 30–3–5 (Supp. 2006), which gives the trial court discretion to grant visitation to immediate family members, and section 30–5–2, which governs grandparent visitation. *Supra* ¶ 40. While these statutes address visitation rights, they do not speak to the circumstances in this case. For obvious reasons, the grandparent visitation statute does not apply to Jones. The immediate family member provision is inapposite because it is included within the "Divorce" chapter of the "Husband and Wife" title of the Utah Code. Furthermore, its specific terms limit its applicability to divorces. For example, section 30–3–5(1)

states that the section applies only "[w]hen a decree of divorce is rendered." Utah Code Ann. § 30–3–5(1) (Supp.2006). Because Jones and Barlow could not legally marry, their separation cannot constitute a divorce, and thus the immediate family member visitation provision does not address the situation at hand. And although the majority does not mention the provisions regarding parent-time for divorced or divorcing parents, *id.* §§ 30–3–32 to –38 (Supp.2006), I likewise do not believe that the parent-time provisions govern the case before us.

¶ 47 The policy considerations underlying the visitation statutes would nevertheless be served by permitting Jones to visit the child. A child has a need and a right to maintain a relationship with both parents. For example, section 30–3–32(2)(b)(i), which governs visitation between divorced, divorcing, or adjudicated parents, states that "it is in the best interests of the child of divorcing ... parents to have frequent, meaningful, and continuing access to each parent following separation." Likewise, section 30–3–5(5)(a) recognizes that, in some circumstances, visitation with "immediate family" members may serve a child's best interests.

¶ 48 Jones has been, literally and for all intents and purposes, a member of the child's immediate family since her birth. The term "immediate family member" is not defined in conjunction with section 30–3–5 or anywhere else in Title 30. However, the term is defined in other sections of the Utah Code. The Utah Code definition of "immediate family member" generally includes spouses, children, parents, and siblings, *id.* §§ 7–9–3(7) (2006), 76–8–316(4)(a) (2003), but it also may include grandparents, grandchildren, and nieces and nephews. *See id.* § 26–2–22(3)(a) (Supp.2006) (including grandparents and grandchildren in definition); *id.* § 34A–2–103(5)(a)(ii) (Supp.2006) (including grandparents, grandchildren, nephews, and nieces in definition); *id.* § 36–11–102(5) (2005) (defining immediate family as a spouse or child residing in the household). The most expansive definition of immediate family member is found in Utah Code section 76–5–106.5, which addresses stalking. In that section, an immediate family member is defined as "a

spouse, parent, child, sibling, or *any other person who regularly resides in the household* or who regularly resided in the household within the prior six months." *Id.* § 76–5–106.5(1)(b) (2003) (emphasis added). Under this definition, Jones would be an immediate family member because she regularly resided in the same household as the child within six months prior to the initiation of this suit.

¶ 49 I believe Jones satisfies any reasonable definition of immediate family member because she was, de facto, the child's parent. By caring for the child from her infancy and for the first two years of her life, Jones, with the acquiescence and encouragement of Barlow, acted as the child's "other parent." Although the reality and nature of this relationship has not been explicitly acknowledged by Utah's statutory law, Jones and Barlow did everything within their power to make Jones the legal equivalent of a parent. When Jones and Barlow solemnized their relationship with a Vermont civil union, the state of Vermont endowed Jones with the same rights granted to a spouse. *See* Vt. Stat. Ann. tit. 15, § 1204 (2002). Under Vermont law, the civil union makes Jones an immediate family member and grants her the same rights as a spouse with respect to a child born to Barlow during the civil union. *Id.* § 1204(f). Although the parties have not addressed the effect of their Vermont civil union on their rights, the undertaking of that status conclusively demonstrates that when the parties entered into it, they intended Jones to be a parent to any children born to them. Likewise, the guardianship petition, which was filed and granted under Utah law, strongly supports the conclusion that the parties regarded Jones as a full-fledged parent. Indeed, the guardianship petition stated that "[Jones] is the only other parent that [the child] knows or will know," and the supporting memorandum stated that "[s]ince [the child's] birth, [Jones] has served as her other parent in all regards." Based on the parties' actions, it is clear that the parties did everything they could to make their relationship, with regard to themselves and the child, as much like the "traditional family"—two married parents and children—as possible. There were virtually no functional differ-

ences from a traditional union insofar as the care and treatment of their child was concerned. *Nevertheless, the statutes do not address either Jones' or the child's rights in this situation.*

¶ 50 As the legislature recognized by enacting visitation statutes, children have the right to maintain relationships with their parents as well as with persons with whom they have formed deep, parent-like bonds. A child's rights and best interests do not change depending on whether his or her parental figures are recognized as parents under the law or whether they are simply parents in fact. Thus, in this case, the child's need for, and right to, a continuing relationship with both of her parents is not diminished by the fact that only one is a biological parent or that her parents were not legally married. Therefore, granting standing to Jones would further the legislative policy of protecting children who have formed such bonds, even though the statutes do not specifically apply.

II. BECAUSE THE LEGISLATURE HAS NOT SPOKEN ON THIS ISSUE, THIS COURT SHOULD LOOK TO THE COMMON LAW

¶ 51 In the absence of a controlling statutory provision, I look to our common law. This court has recognized that a person who is not a child's natural or legal parent does not necessarily "stand as a total stranger to the child." *State ex rel. J.W.F.*, 799 P.2d 710, 714 (Utah 1990). Traditionally, a third party's right to visitation has arisen under the doctrine of in loco parentis. For example, in *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978), this court relied on the doctrine of in loco parentis to hold that a stepparent was a parent for purposes of the divorce statute and, accordingly, granted the stepparent standing to petition for visitation. *Id.* at 66–68.

¶ 52 While we applied in loco parentis in the context of a statutory divorce proceeding in *Gribble*, I reject the notion that in loco parentis applies only in conjunction with a statute. In loco parentis is a common law doctrine. That a common law doctrine may inform our statutory interpretation in some cases does not strip the common law of its ability to stand on its own in the absence of an applicable statute. Nothing in *Gribble*, or in any subsequent case, limits the doctrine of in loco parentis to divorce proceedings, and I believe it can apply notwithstanding the absence of a controlling statute in this case. In fact, as common law, it is arguably more pertinent in a case such as the one before us, where there is not a relevant statute, than in *Gribble*, where there was a statute applying to the dissolution of legal marriages.

¶ 53 Nevertheless, I concede that the doctrine of in loco parentis has its limitations. As the majority recognizes, in loco parentis is a temporary status that lasts only as long as the third party assumes the role of a parent in the child's life. *See* 59 Am.Jur.2d *Parent and Child* § 9 (2002); *supra* ¶ 15. It does not grant rights or impose duties—such as visitation or support—once either the surrogate parent or the child has decided to end the relationship.

¶ 54 I likewise agree with the majority's assertion that the *Gribble* court erred in concluding that only the surrogate parent or the child can terminate the parental relationship. *Supra* ¶ 17. I disagree, however, with the majority's analysis as to why that conclusion was erroneous. *Gribble's* conclusion that only the surrogate parent or child can terminate an in loco parentis relationship is not erroneous because the cases on which it relies or legal encyclopedias state only that an in loco parentis relationship "may" be terminated by either the surrogate parent or the natural parent. While legal commentary or case law from our sister states, even case law on which we have relied, may differ from our statement of the law, such variances do not abrogate our conclusions. We are not bound to interpret our common law in the same way as our sister states or other commentators. Thus, even though the cases cited in *Gribble* do not state that "only" the surrogate parent or the child can terminate the relationship, that does not necessarily mean that we reached a faulty conclusion.

¶ 55 Rather, I believe *Gribble's* statement that only the surrogate parent or the child can terminate an in loco parentis relationship

is erroneous because, as a matter of principle, it gives an unfair advantage to surrogate parents, essentially allowing them to use in loco parentis as both a shield and a sword. To use the majority's example, it allows surrogate parents to use in loco parentis as a way to shield themselves from support obligations by arguing they have terminated the relationship, while in other instances, it allows the surrogate parent to continue the in loco parentis relationship despite the objections of the biological parent. *Supra* ¶ 24. I agree with the majority that this is an absurd result and, on policy grounds, likewise reject the notion that a biological parent cannot sever an in loco parentis relationship. Thus, I agree that Jones' in loco parentis status terminated when Barlow and the child moved out.

¶ 56 This conclusion does not, however, change my belief that Jones has standing under our common law. Perhaps due to the limitations of the doctrine of in loco parentis, this court's decisions to grant standing to third parties have not been limited to in loco parentis cases. For example, in *J.W.F.*, we granted a petitioner standing to petition for custody of his estranged wife's child. 799 P.2d at 712. In that case, the petitioner had never acted as a parent toward the child because the child was born while the petitioner and his wife were separated, although they remained legally married. *Id.* In fact, the petitioner did not even know about the child until after his wife had abandoned the child and the state had filed a neglect and abandonment petition. *Id.* We granted the petitioner standing based on his stepparent status and his legal support obligations. *Id.* at 716. In so holding, we recognized that "[c]ertain people, because of their relationship to a child, are at least entitled to standing to seek a determination as to whether it would be in the best interests of the child for them to have custody." *Id.* at 714; *see also Wilson v. Family Servs. Div.*, 554 P.2d 227, 230–31 (Utah 1976) (granting grandmother a hearing on her petition to adopt grandchild after the parents' rights were terminated).

¶ 57 In *J.W.F.*, we recognized several factors that may justify granting standing to a third party, such as financial obligations or the person's status or relationship to a child. 799 P.2d at 715. We noted that the relationship of a close relative who has the child's best interests at heart "would seem to warrant a grant of standing." *Id.* However, we specifically declined to limit standing to a petitioner related to a child by marriage [1] or to divorce proceedings, noting that "it is conceivable that persons who are not related by blood or marriage, although not presumptively entitled to standing, could show that they had a relationship with the child that would warrant a grant of standing." *Id.* at 715 n. 4.

¶ 58 I would therefore conclude that Jones has standing under our common law. My conclusion is not based on the doctrine of in loco parentis, nor is it based on any specific prior case issued by this court. Indeed, as the majority points out, there is no binding case law regarding an unmarried partner's standing rights. *Supra* ¶ ¶ 1–2. Rather, I would recognize that Jones has standing because she is a de facto parent.

¶ 59 Like a person holding in loco parentis status, a de facto parent [2] is a person "who, on a day-to-day basis, assumes the role of parent, seeking to fulfill both the child's physical and psychological needs." *I.F. v. K.M. (State ex rel. C.M.)*, 2000 UT App 115, ¶ 3 (citing *In re Hirenia C.*, 18 Cal.App.4th 504, 22 Cal.Rptr.2d 443, 448 (1993)); *see also Miller v. Cal. Dep't of Soc. Servs.*, 355 F.3d 1172, 1176 (9th Cir.2004). There are, however, some differences between the in loco par-

---

1. The parties have not raised or argued the effect of their lawful civil union in Vermont, but its existence does enhance the analogy of Jones' status to that of a stepparent in that these parents took the only step available to them to legalize their relationship.

2. Some courts have used the term psychological parent to refer to a third party who has, with the consent of the legal parent, assumed a parent-like relationship with a child. *See, e.g., V.C. v.* *M.J.B.*, 163 N.J. 200, 748 A.2d 539, 555 (2000) (holding that "[t]hird parties who live in familial circumstances with a child and his or her legal parent may achieve, with the consent of the legal parent, a *psychological parent* status vis-a-vis a child" (emphasis added)). While cases using the term psychological parent are very similar to this case, I consider the term de facto parent more descriptive functionally.

entis and de facto parenthood doctrines. There are certain evidentiary criteria, which I will discuss in Section III, that are not required in in loco parentis cases but that are required in de facto parent cases in order for a third party to show that he or she has, with the legal parent's intent, formed a parent-child relationship with the child. Further, while in loco parentis imposes only temporary rights and obligations on a surrogate parent, de facto parenthood is permanent. Functionally, a de facto parent is just like the child's legal parent. The only difference is that a de facto parent is not biologically related to the child and does not have an adjudicated parental status such as adoption. Because de facto parenthood is more akin to actual parenthood, de facto parents cannot unilaterally sever their obligations to the child. Nor can a legal parent independently sever a de facto parent's rights. Rather, once a child shares a de facto parent relationship with a third party, the child has a vested right to support from the de facto parent as well as to maintain a relationship with that parent, despite the objections of either the de facto or legal parent.[3]

¶ 60 I recognize that de facto parenthood has never been recognized by this court. The absence of a binding judicial pronouncement on an unmarried surrogate parent's right to standing does not mean that we must conclude that Jones does not have standing under the common law. In fact, in the arena of domestic relations, "judges have traditionally decided ... questions using common law methods," Ann Laquer Estin, *Family Governance in the Age of Divorce*, 1998 Utah L.Rev. 211, 238, and the "common law is not static, but is rather a dynamic and growing thing," 15A Am.Jur.2d *Common Law* § 2 (2000). Our ability to decide cases on com-

mon law grounds is therefore not limited to common law doctrines that have been explicitly developed in prior case law. *See Housing Fin. & Dev. Corp. v. Ferguson*, 91 Hawai'i 81, 979 P.2d 1107, 1115 (1999) (noting that the common law is not "limited to published judicial precedent"). Rather, the common law embodies "broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice." 15A Am.Jur.2d *Common Law* § 1 (2000). It "is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society." *Id.* § 2.

¶ 61 The common law is able to adapt and grow because the common law system endows courts with "judicial inventiveness to meet new situations." *Id.* Indeed, by definition, the common law is "judge-made" law. M. Stuart Madden, *The Vital Common Law: Its Role in a Statutory Age*, 18 U. Ark. Little Rock L.J. 555, 558 (1996). As one judge has recognized, the common law encompasses " 'any body of law *created* primarily through judges by their decisions rather than by the framers of statutes or constitutions.' " *Id.* (emphasis added) (quoting Richard A. Posner, *The Problems of Jurisprudence* 247 (1990)). Thus, the judicial role in a common law system is not solely to apply legislative enactments. Where the legislature has not acted, we frequently exercise the power to articulate rights and obligations that have not previously been recognized.[4] The history of tort law, contract law, property law, domestic relations law, employment law, and even the criminal law reflects this law-development function of state courts. This case raises a question that has not heretofore been addressed by either the courts or the legislature in Utah. We have, however, rec-

---

**3.** De facto parenthood is a two-way street. While de facto parent status entitles a third party to standing for visitation, it also requires a de facto parent to provide financial support for the child. *See Chambers v. Chambers*, 2005 WL 645220, *7 2005 Del.Fam. Ct. LEXIS 1, *22 (holding that a de facto parent could be equitably estopped from denying she owed a support obligation to her former partner's child). This is entirely consistent with the purpose of de facto parenthood: to provide children with the parental support and protection to which they are entitled. In fact, the district court in this case

ordered Jones to pay child support, a result that will presumably be impossible under the majority's analysis.

**4.** It is important that this court not abdicate its responsibility to address new and difficult legal questions that come before it. By examining new issues in relation to our common law principles, this court engages in a dialogue with the legislature, whose members can benefit from our careful consideration and analysis of the law in relation to the changing world in which we live.

ognized that in some cases a third party ought to have standing in proceedings affecting the custody of children and that

> [t]here is no reason to narrowly restrict participation in custodial proceedings. Indeed, our case law and the legislature's pronouncements indicate that the interests of the child are best served when those interested in the child are permitted to assert that interest. The question of who should have custody of the child is too important to exclude participants on narrowly drawn technical grounds.... Those who have legal *or personal* connections with the child should not be precluded from being heard on best interests.

*J.W.F.*, 799 P.2d at 716 (emphasis added); *see also Gribble*, 583 P.2d at 68. I would therefore recognize de facto parent standing as a common law principle in order to serve the broader policy regarding a child's right to visitation with an individual with whom she has formed a true parental bond. To hold otherwise ignores the reality that children can and do form parent-child relationships with persons with whom they do not share a biological legal connection.[5] For example,

> Daily contact with, continuous reliance on, and the development of psychological attachments to unrelated persons will often stimulate a sense of "family" among biologically unrelated individuals. It is within this framework of expanding social definitions of the family that adults who are not the biological parents of the children they care for come to be seen as parents. The daily interactions that take place between children and their nonbiological caregivers and the corresponding psychological attachments that form between them effectively elevate their relationships to that of a parent and a child, rather than simply that of a child and a caregiver. As a result, children routinely form parent-child relationships with their stepparents, adop-

tive parents, foster parents, and even aunts, uncles, and grandparents who care for them on a daily basis.

Mellisa Holtzman, *Definitions of the Family as an Impetus for Legal Change in Custody Decision Making: Suggestions from an Empirical Case Study*, 31 Law & Soc. Inquiry 1, 9 (2006) (citation omitted). As the "nontraditional family" becomes more prevalent in our society, children will increasingly form parent-child relationships with third parties.

¶ 62 While this case is, in part, about parental rights, it is also about whether children in nontraditional families, with nontraditional but nonetheless real parents, are entitled to have their interests addressed just as if they had been born into traditional families. The child in this case is the product of a same-sex relationship, but she just as easily could have come from a more traditional one. Her opportunity to have the courts determine whether visitation with one of her parents is important to her present and long-term best interests should not be foreclosed. Indeed, children of dissolving, nontraditional relationships are just "as likely to become ... victim[s] of turmoil and adult hostility as [are children] subject to the dissolution of a [traditional] marriage." *Holtzman v. Knott (In re Custody of H.S.H–K.)*, 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995), *cert. denied*, 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995). These children "need[ ] and deserve[ ] the protection of the courts as much as [children] of [ ] dissolving traditional relationship[s]." *Id.* To deny the forum of the courts for the resolution of children's interests in nontraditional contexts would be to deny those children the protections afforded to all other children. This is contrary to "the public welfare and the true interests of justice." 15A Am.Jur.2d *Common Law* § 2 (2000). Accordingly, I would hold that de facto parents have standing to petition for visitation.[6]

---

**5.** As I discuss later in this opinion, the fact that such relationships are formed with the full consent and participation of a biological or legal parent is important. A relationship undertaken without such consent and participation should not have de facto parent status because of the risk that it will undermine the cohesiveness and

parental control presumed to exist in intact families.

**6.** The majority repeatedly states that parents are the only persons with rights to *custody* of a child. *Supra* ¶ 39 & n. 9. In the case before us, however, we are dealing with the issue of visitation— distinct from custody. In the context of visita-

¶ 63 I am not the first to reach this conclusion; other courts have confronted the visitation rights of a de facto parent in the absence of an authorizing statute and have granted standing to de facto parents. For example, in 1995 the Wisconsin Supreme Court decided *H.S.H–K.*, where two women who had shared a committed relationship for ten years decided to have a child through artificial insemination. 533 N.W.2d at 421. As in this case, both women actively participated in doctor visits, childbirth classes, and the actual delivery. *Id.* When the child was born, the women gave the baby a surname that combined both of their last names. *Id.* at 421–22. Thereafter, the two women and the child lived together, both women actively parented the child, and they held themselves out as a family. *Id.* at 422. Several years later, the relationship between the two women dissolved, and the biological mother attempted to terminate the relationship between the child and her former partner. *Id.* The partner filed a petition for custody and visitation. *Id.*

¶ 64 The Wisconsin Supreme Court determined that the partner did not have standing under the state's relevant custody statute, which conditioned third-party standing on a showing of parental unfitness. *Id.* at 423–24 (discussing Wis. Stat. § 767.24 (1991–92)). The partner had not made such a showing. *Id.* at 424. In addition, the court determined that the state's visitation statute did not give the partner standing because it applied only when there had been a dissolution of a marriage. *Id.* at 424, 429–30. Because the parties were a same-sex couple, there was no marital dissolution and the statute did not apply. *Id.* The court determined that the legislature had not occupied the field and

relied on its equitable powers to hold that a court may hear a petition for visitation when it determines the petitioner has a "parent-like" relationship with the child and a significant triggering event, such as the severance of the relationship between a child and a parental figure, justifies state intervention. *Id.* at 424–25, 435.

¶ 65 More recently, the Washington Supreme Court decided *Carvin v. Britain (In re Parentage of L.B.)*, 155 Wash.2d 679, 122 P.3d 161 (2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006). Like *H.S.H.–K.*, *L.B.* involved two women in an intimate relationship who decided to have a baby by artificial insemination. *Id.* at 164. When the child was born, the women and the child lived together as a family unit with both women sharing parenting responsibilities. *Id.* The child called her biological mother "mama" and the mother's partner "mommy." *Id.* When the child was six, the parties separated, and shortly thereafter, the biological mother unilaterally terminated the relationship between the child and her former partner. *Id.* The court looked to Washington's statutes and found that they were "conspicuously silent" regarding the rights of children in nontraditional families. *Id.* at 169. However, the court found that the statutes displayed an intent to protect the welfare of children and did not provide any evidence that the legislature intended to preempt the court's common law jurisprudence over circumstances not yet contemplated by the legislature. *Id.* at 172–73, 176–77. Thus the court held that a de facto parent would have standing and remanded to the district court for a determination of whether the partner qualified as a de facto parent.[7] *Id.* at 179.

tion, the rights of third parties do not "mature" only upon the death of a parent or ·the termination of parental rights. This is evidenced by Utah's grandparent visitation statute. *See* Utah Code Ann. § 30–5–2; *Uzelac v. Thurgood (In re Estate of S.T.T.)*, 2006 UT 46, 144 P.3d 1083 (upholding grant of visitation to grandparents when the father was not unfit or deceased). Additionally, the majority states that "parental rights shall not be disturbed absent a determination that the legal parents are unfit." *Supra* ¶ ¶ 39, 28. The United States Supreme Court held otherwise in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion), and this court agreed in *In re Estate of*

*S.T.T.*, 2006 UT 46, 144 P.3d 1083, both cases discussed *infra* Section IV.

By the same token, the majority relies on the status of "mother" or "parent." *Supra* ¶ 40. We note that Jones is seeking only rights to visitation with the child, not all the rights associated with being a parent, an arrangement beyond the scope of this opinion.

7. *L.B.* and *H.S.H–K.* are ·in accord with other jurisdictions that have used the common law to grant standing to a third party who has developed a parent-like relationship with a child. *See, e.g., E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d

¶ 66 Like these jurisdictions, I would recognize common law standing for de facto parents. I therefore turn to a discussion of what a third party must prove in order to obtain de facto parent status.

### III. THE DE FACTO PARENT TEST AND ITS APPLICATION TO JONES

¶ 67 The determination that a de facto parent has standing to petition for visitation does not end the analysis, which must include consideration of what a petitioner must demonstrate to establish that he or she is a de facto parent. In *Holtzman v. Knott (In re Custody of H.S.H–K.),* 193 Wis.2d 649, 533 N.W.2d 419 (1995), *cert. denied,* 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995), the Wisconsin Supreme Court established a four-part test to determine whether the petitioner was a de facto parent. *Id.* at 435–36. Under that test, the petitioner must prove:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.; see also V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539, 551–52 (2000), *cert. denied,* 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000) (adopting the *H.S.H–K.* four-part test to determine de facto parent standing); *Carvin v. Britain (In re Parentage of L.B.),* 155 Wash.2d 679, 122 P.3d 161, 177 (2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006) (same).

¶ 68 Although I find the Wisconsin test very helpful, I would revise it slightly. The elements requiring that the petitioner live with the child, assume parental obligations, and assume the role of a parent for a sufficient length of time all relate to the ultimate question of whether a parent-child relationship actually existed between the petitioner and the child. Thus, I would simplify the test by combining the second, third, and fourth parts of the Wisconsin test into one element requiring the petitioner to establish the existence of an actual parent-child relationship between the petitioner and the child. I would therefore require that a third party claiming de facto parent status establish by clear and convincing evidence that (1) the legal parent intended to create a permanent parent-child relationship between the third party and the child, and (2) an actual parent-child relationship was formed. To establish the second element, a third party must, at a minimum, present evidence demonstrating that the third party lived with and cared for the child and that, as a result, a parent-child bond developed between the third party and the child.

¶ 69 The facts in this case easily satisfy this test, although I recognize that other cases may not be so clear. I therefore emphasize that de facto parent status is "limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life," *C.E.W. v. D.E.W.,* 845 A.2d 1146, 1152 (Me.2004), and that undertaking must generally be with the full consent, encouragement, and cooperation of a fit custodial parent. I would therefore require that a petitioner claiming de facto parent status prove the two elements of our test by clear and convincing evidence. This burden of proof sets a high threshold, not easily cleared or automatically met by every person who lives with or cares for a child.

886, 890–92 (1999), *cert. denied,* 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999) (determining that the court's equitable powers governed the resolution of a same-sex partner's de facto parent claim despite a lack of statutory authority); *T.B. v. L.R.M.,* 567 Pa. 222, 786 A.2d 913,

917 (2001) (rejecting the argument that a partner lacked standing because the statutory scheme did not encompass former partners or paramours and finding standing under the common law doctrine of in loco parentis).

¶ 70 The majority suggests that the "fact-intensive inquir[y]" necessary to determine de facto parent status falls outside the bounds of the traditional role of standing as a gate-keeping tool in litigation. *Supra* ¶ 31. This court, however, has recognized that "some cases require more extensive fact-finding in order to assess whether the plaintiff's interest in the dispute is sufficient to give rise to" standing. *Sierra Club v. Sevier Power Co.*, 2006 UT 74, ¶ 28 & n. 3, 148 P.3d 960 (noting that the determination of whether plaintiff's interests are sufficient or too attenuated "must be made on a case-by-case basis, taking into account all relevant facts and the policies underlying our standing requirement"); *see also Washington County Water Conservancy v. Morgan*, 2003 UT 58, 82 P.3d 1125 (requiring extensive fact-finding, including a trial and expert testimony, to determine if plaintiff had standing). While we noted in *Sierra Club* that instances of intensive factual development at the standing phase are rare, they do exist, 2006 UT 74, ¶ 28 n. 3, 148 P.3d 960, and de facto parenthood cases may present one such situation. While the inquiry into whether de facto parent status exists may require a fact intensive inquiry at the standing phase, it in no way supplants the ultimate issue in a visitation dispute—the best interests of the child. Thus, a determination of de facto parenthood would not replace a trial on the merits. While the determination of de facto parenthood may burden the legal parent with litiga-tion, in instances where the inquiry will be factually intensive, a legal parent has already allowed a *significant* relationship to develop between his or her child·and a third party, and thus, the legal parent's rights must yield in favor of the best interests of the child. The issue of de facto parent status simply presents an example of the rare situation when the determination of standing may involve complex factual inquiries that a court must consider before it examines the merits of the case. I now proceed to discuss each part of the de facto parent test and its application to Jones.

### A. Intent of the Legal Parent

¶ 71 A party claiming de facto parent status must first show that the legal parent intended the third party and the child to form a permanent parent-child relationship. For this step to be satisfied, the court must find that the legal parent's "own actions led to the creation of [a] parental bond" between the third party and the child, *J.C. v. C.T.*, 184 Misc.2d 935, 711 N.Y.S.2d 295, 299 (Fam.Ct. 2000), and that at the time the bond formed, the legal parent intended it to be permanent, as opposed to temporary, however long.[8] In other words, the legal parent must have consented to and fostered the petitioner's formation and establishment of a parental relationship with the child.[9] *See V.C.*, 163 N.J. 200, 748 A.2d 539, 552 (2000), *cert. denied*, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243

---

**8.** A parent may delegate to a third party a degree of parental authority that the parent intends, from the outset, to be temporary. Examples of such temporary delegation include a parent's appointment of a third party to care for a child while the parent completes military service, serves a prison sentence, or is hospitalized for an extensive period. Third parties that are meant to stand in the place of a parent for only a temporary period of time are not eligible for de facto parent standing.

**9.** The majority cites *In re Adoption of P.N.* for the proposition that custody may not be awarded to a third party absent the termination of parental rights of the natural parents. *Supra* ¶ 39 & n. 10. The majority again relies on a case where the parties were seeking not only permanent custody, but adoption. Furthermore, the language from *P.N.* states that the rights of the biological parents could not be "permanently cut off" when the parents "have not been found unfit" and when they "have not consented to such placement." *A.N. v. M.I.W. (In re Adoption of P.N.)*, 2006 UT 64, ¶¶ 4, 15, 148 P.3d 927. The facts in *P.N.* were vastly different from those in the case before us. Whereas Barlow fostered the relationship between Jones and the child, P.N. was placed with the prospective adoptive family without the biological father's consent, and he adamantly objected to the custody arrangement with legal strangers from its initiation. *Id.* ¶ 4. The lack of consent by the biological parent in *P.N.* sets that case apart from the predicament that Jones finds herself in today, where the biological parent encouraged the relationship and is now objecting to its continuation in any manner. Additionally, in *P.N.*, the complete deprivation of the biological parents' rights was at issue; Jones does not seek to eliminate the child's relationship with Barlow, but merely asks to continue her relationship with the child because she has acted as a de facto parent to the child since birth.

(2000). A third party can prove this by showing that the legal parent "ceded over to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant." *Id.*

¶ 72 The focus of this part of the test is on the legal parent's intent at the formation and during the pendency of the parent-child relationship, not at the termination of the relationship between the legal parent and a third party. *Id.; see also T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 919 (2001) (noting that what is relevant to an in loco parentis determination is the method by which a third party gained authority to assume parental status, and holding that where the biological parent encouraged the partner to assume the status of parent and acquiesced as the partner carried out day-to-day care of the child, she could not erase the relationship created with the child after the parties separated). Once the legal parent intentionally creates a de facto parent for his or her child, the legal parent cannot later change his or her mind and unilaterally sever or alter the nature of that relationship. However, this does not mandate that a legal parent form this intent at the conception or birth of the child. The de facto parent's participation in the actual decision to have a child and the process of conception, while highly probative of intent where present, is not required. *See V.C.*, 748 A.2d at 552–53 (recognizing that the situation in which the partner does not participate in the decision to conceive "parallel[s] the situation in which a woman, already pregnant or a mother, becomes involved with or marries a man who is not the biological or adoptive father of the child, but thereafter fully functions in every respect as a father"). A parent can intend to create a de facto parent-child relationship with a third party anytime during the child's life.

¶ 73 The intent requirement is critical because it ensures that the legal parent "has the absolute ability to maintain a zone of autonomous privacy for herself and her child." *Id.* at 552. If the legal parent wishes to maintain that zone of privacy, he or she need only choose not to delegate parental authority or encourage the formation of a permanent, parent-like relationship between his or her child and another party, and avoid any overt acts in furtherance of such a relationship. Moreover, the intent requirement limits the people who can qualify as de facto parents. For example, under this standard, a nanny or other caretaker will not qualify as a de facto parent because a parent does not intend these relationships to be parental or permanent. Additionally, this part of the test prevents roommates, live-in boyfriends or girlfriends, or significant others from automatically qualifying as de facto parents. While a party that lives with a legal parent and his or her children will likely participate in parental responsibilities to some degree, that participation, by itself, is not enough. A claimant in this position would have to show by clear and convincing evidence that the legal parent intended to create a parent-child relationship and intentionally ceded over a sufficiently significant amount of parental responsibility to create a permanent parental relationship between the claimant and the child. I believe the intent requirement gives due consideration to a parent's right to maintain an autonomous zone of privacy. However, if the legal parent wishes to keep intact this zone of privacy, he or she cannot give a third party "parental authority the exercise of which may create a profound bond with the child." *Id.*

¶ 74 A party claiming de facto parent status must do more than merely allege intent; the party must also point to specific behavior of the legal parent that clearly manifests that intent. This is a case-specific requirement that can be satisfied by a variety of behavioral evidence. There is not, therefore, any specific factor that is required or that will, on its own, be conclusive. Rather, a court must carefully examine all of the evidence to determine whether proof of the requisite intent is clear and convincing.

¶ 75 In the case before us, Barlow's behavior amply demonstrates that, even before the child's birth, Barlow intended Jones to be an equal, permanent parent. Shortly after becoming engaged, Barlow and Jones mutually decided to have children together and formulated a plan whereby Barlow would bear the

first child and Jones would bear the second. Pursuant to this plan, Barlow allowed Jones to participate in the selection of a sperm donor, and together the parties selected a donor that shared both of their traits. Jones attended all prenatal matters relating to the artificial insemination and, following conception, participated in prenatal care with Barlow and the physician. During the pregnancy, Jones and Barlow entered into a civil union which, at least in Vermont, conferred rights on each of them respecting children born during the union. Barlow allowed Jones to be present at the delivery and participate to the extent possible. After the child was born, Barlow and Jones chose a name that would reflect both of their surnames and listed that name on the birth certificate.

¶ 76 Barlow continued to openly exhibit her intent that Jones function in a parental role after the child's birth. Barlow, Jones, and the child lived together and held themselves out as the "Jones–Barlow" family. Barlow and Jones both held themselves out as the child's parents. The child and Barlow both called Jones "Mommy," while Barlow was called "Momma." Jones provided financial support for the child, attended pediatric appointments with her, and participated in her daily care through such activities as dressing her, feeding her, and taking her to child care. Jones would not have been able to participate in these activities, at least to the extent she did, without Barlow's consent.

¶ 77 Perhaps the most convincing fact is that Barlow designated Jones as the child's legal co-guardian. In fact, the "Verified Petition for Appointment of Co–Guardians for a Minor" stated that "[Jones] is the only other parent that [the child] knows or will know" and the Supporting Memorandum stated that "[s]ince [the child's] birth, [Jones] has served as her other parent in all regards." Jones and Barlow took further steps to ensure that Jones could protect the child as she would if she were a legal parent, including preparing estate planning documents and naming each other as beneficiaries on life insurance policies to ensure that the child would be cared for in an emergency.

¶ 78 I do not mean to suggest that designating another party as a co-guardian, standing alone, is determinative. To the contrary, I do not believe that a co-guardianship, on its own, would be enough to satisfy this part of the test given that co-guardianships are established for a number of reasons, many of which do not involve the intent to create a permanent parent-child relationship. However, combined with Jones' participation in bringing the child into the world and her daily support thereafter, I find the language and content of the co-guardianship petition in this case particularly persuasive.

¶ 79 Other jurisdictions have relied on actions similar to Barlow's in determining whether a third party is a de facto parent. For example, in *V.C.*, the mother and her partner jointly decided to have children, chose a sperm donor, and participated in prenatal care together. 748 A.2d at 542–43. The children called the partner "Meema," and the biological mother referred to her partner as the mother of her children. *Id.* at 543. The parties and the children lived together as a family, and the partner assumed many day-to-day obligations of parenthood and provided financial support. *Id.* The New Jersey Supreme Court held that the record supported the conclusion that the mother had "fostered and cultivated, in every way, the development of a parent-child bond between [her partner] and [her children]." *Id.* at 555.

¶ 80 Likewise, in *E.N.O. v. L.M.M.*, the court held that the mother's partner was a de facto parent. 429 Mass. 824, 711 N.E.2d 886, 892–93 (1999), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999). There, the parties jointly decided to have a child, the partner cared for the mother during pregnancy, the child was given both parties' surnames, the parties sent out birth announcements listing them both as parents, and the partner assumed most of the financial responsibility for the family and assisted in caring for the child. *Id.* at 888–89; *see also Carvin v. Britain (In re Parentage of L.B.)*, 155 Wash.2d 679, 122 P.3d 161, 163–65 (2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006) (looking to factors such as the parties' mutual decision to

have a child and selection of a sperm donor, the partner's participation in prenatal care and delivery, the parties' choice to give the child a name that reflected both surnames, the parties' decision to live together as a family unit and hold themselves out as a family, the fact that the child called her mother "Mommy" and the partner "Momma," and the parties' decision to share parenting responsibilities); *T.B.*, 786 A.2d at 914–15 (holding that the partner was a de facto parent where the parties jointly decided to have a child and thereafter lived together, the mother named her partner as a guardian over the child in her will, they engaged in financial planning to provide for the child, and the partner participated in day-to-day child rearing responsibilities, such as taking the child to child care); *H.S.H–K.*, 533 N.W.2d at 421–22 (holding that the partner was a de facto parent where the parties jointly decided to have a child, the partner was present during prenatal appointments and delivery, the parties gave the child a name that reflected both surnames, the partner provided primary financial support, and both women shared child care responsibilities).

¶ 81 Like the above courts, I find a significant amount of evidence manifesting Barlow's intent to give parental rights to Jones. Barlow's actions clearly and convincingly establish that, up until she and Jones separated, she intended Jones to be her child's other parent. I therefore would hold that in this case the intent requirement has been satisfied.

## B. Creation of an Actual Parent–Child Relationship

¶ 82 I now turn to the second part of the de facto parent test. To satisfy this part, the petitioner must prove that he or she and the child formed an actual parent-child relationship. *Cf. Youmans v. Ramos*, 429 Mass. 774, 711 N.E.2d 165 (1999) (holding that an aunt

was a de facto parent where she and the child had developed a substantial mother-daughter relationship). A petitioner satisfies this requirement by establishing that (1) the petitioner lived with and cared for the child on a daily basis, and as a result (2) the petitioner and the child formed a parent-child bond.

### 1. Living With and Caring for the Child

¶ 83 In order for a third party and a child to develop an actual parent-child relationship, the third party must have lived with and cared for the child on a daily basis. *See V.C.*, 748 A.2d at 551 (requiring that a petitioner lived in the same household as the child and assumed obligations of parenthood); *H.S.H–K.*, 533 N.W.2d at 421 (same). There is no minimum period of time during which a third party must have lived with and cared for the child. It is, however, appropriate for a court to consider the amount of time during which the third party has functioned as a parent when determining whether an actual parent-child relationship has been created. *See V.C.*, 748 A.2d at 553. In other words, the petitioner must have functioned in a parental role for a long enough period of time to allow a bonded parent-child relationship to develop. *Id.* "How much time is necessary will turn on the facts of each case," including the child's age,[10] developmental stage, and the nature of the relationship. *Id.*

¶ 84 The care the third party provides to the child during this time must be equivalent to the care a biological or legal parent would provide. This does not require that the third party have the exact same relationship with the child or assume the same responsibilities toward the child as the legal parent. Rather, it demands that the third party assume the normal "obligations of parenthood" and do so without the expectation of financial compensation. *Id.* at 551. These obligations include "taking significant responsibility for the child's care, education and development,"

---

**10.** Research indicates that children can begin to form strong bonds at a very early age. *See, e.g.,* Joan B. Kelly & Michael E. Lamb, *Using Child Development Research to Make Appropriate Custody and Access Decisions for Young Children*, 38 Fam. & Conciliation Cts. Rev. 297, 299 (2000) ("In the attachment phase, which occurs be-

tween 7 and 24 months of age, the child ... gives increasingly clear evidence that attachments have been formed."). Thus, while the child's age may be relevant in determining the nature of the relationship, I do not in any way suggest that a very young child is incapable of forming a bonded parent-child relationship with a third party.

*H.S.H–K.*, 533 N.W.2d at 436, and may or may not include financial contributions to the child and the household. *V.C.*, 748 A.2d at 553. As with the other parts of the de facto parent test, this inquiry is fact sensitive and will vary with each individual case.

¶ 85 Turning to the facts of this case, I believe that Jones has clearly and convincingly shown that she lived with and cared for the child on a daily basis. Jones lived with Barlow and the child from the child's birth until the child was two years old. During that time, Jones participated in the child's daily care as if she were a parent. She took her to doctor appointments, dropped her off at child care, and attended to the child's daily personal needs, such as eating and bathing. Jones also provided the child with financial security, not only by providing for the child in her will and securing a life insurance policy, but also by contributing to the household expenses.

¶ 86 As is the case in most two-parent households, Jones' parental obligations and responsibilities were not the same as Barlow's. For example, when the child was an infant, Barlow, as the nursing mother, nearly always fed the child. Likewise, during the first fifteen months of the child's life, Barlow stayed at home while Jones worked. As the child grew, the parties' roles evolved accordingly, with Barlow returning to work and Jones assuming more care-giving responsibilities. These differences, however, do not mean that Jones was not fulfilling a parental role. Indeed, this division of roles is nearly identical to that frequently found between married men and women with children. Like the district court, I am convinced that Jones "assumed the obligations of parenthood by taking sufficient and significant responsibility for the child's care, upbringing, future edu-cation and well-being ... without expectation of financial compensation."

¶ 87 I recognize that Jones' role had changed by the time she filed her petition for visitation. Barlow and the child had moved out, and therefore Jones was no longer living with the child and caring for her on a daily basis. This is not problematic, however. Unlike the doctrine of in loco parentis, a de facto parent need not still be living in the same household as the child at the time the petition is filed; in fact, it is highly unlikely that he or she will be. The third party need only petition the court for visitation within a reasonable time after the legal parent interferes with the third party's relationship with the child. As a practical matter, this interference often will not occur until the third party and the child no longer live together and the legal parent denies visitation.[11] In this case, Jones filed her petition within a reasonable time of Barlow's interference. The parties separated on November 7, 2003, Barlow denied Jones visitation with the child later that same month, and Jones filed her complaint on December 19, 2003. Thus, Jones satisfies our requirement that she lived with and cared for the child on a day-to-day basis.

2. Actual Parent–Child Bonding

¶ 88 In addition to the requirement that a petitioner live with and care for the child, to prove the existence of an actual parent-child relationship, the petitioner must show that the petitioner and the child share "a relationship with deep emotional bonds such that the child recognizes the person, independent of the legal form of the relationship, as a parent from whom they receive daily guidance and nurturance." *In re E.L.M.C.*, 100 P.3d 546, 559 (Colo.Ct.App.2004), *cert. denied*, 2004 WL 2377164, 2004 Colo. LEXIS 851, *cert.*

---

11. I do not believe it is necessary to establish a definite period of time after the petitioner moves from the child's household in which a petition for visitation must be filed. I recognize, and indeed hope, that parties will often resolve matters of visitation on their own, without involving the courts. I also recognize, however, that parties may not be able to resolve their differences regarding visitation, or that the legal parent may suddenly terminate visitation with the third party after that party has enjoyed visitation with the child for months or even years. Setting a limitations period that begins at the date the petitioner moves from the child's household would foreclose a remedy to de facto parents and their children when a legal parent has agreed to allow visitation but later changes his or her mind and denies it. I therefore would require only that a petition be filed within a reasonable time after the legal parent interferes with the relationship between the third party and the child.

*denied,* 545 U.S. 1111, 125 S.Ct. 2551, 162 L.Ed.2d 287 (2005). A child can form this type of relationship regardless of whether the potential de facto parent is biologically related to the child. *See, e.g.,* J. Hammond Muench & Martin R. Levy, *Psychological Parentage: A Natural Right,* 13 Fam. L.Q. 129, 152 (1979) ("[T]he child's development depends upon the continuity and character of [the] relationship with the adult he perceives as his parent, and ... this perception rather than the fact of biological parenthood is the basis of their relationship." (citation omitted)); *Smith v. Org. of Foster Families for Equality and Reform,* 431 U.S. 816, 843, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) ("[B]iological relationships are not [the] exclusive determination of the existence of a family."). Rather, bonded parent-child relationships form when children "receive sensitive and responsive care from familiar adults," who may or may not be biologically related, in the course of everyday care—such as being fed, held, spoken to, played with, soothed, and stimulated. Joan B. Kelley & Michael E. Lamb, *Using Child Development Research to Make Appropriate Custody and Access Decisions for Young Children,* 38 Fam. & Conciliation Cts. Rev. 297, 298 (2000); *see also Smith,* 431 U.S. at 844, 97 S.Ct. 2094 ("[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children." (citation omitted) (alteration in original)). In addition, parent-child bonds develop and grow stronger when the child spends time in the third party's general proximity. Kelley & Lamb, *supra* ¶ 88, at 298.

¶ 89 There is ample evidence of an actual parent-child bond in this case. As noted previously, Jones lived with and cared for the child for the first two years of the child's life. Jones testified that she felt bonded to the child during this time, particularly in the mornings when she and the child were alone. Moreover, as is evident by this lawsuit, Jones seriously wishes to maintain this relationship. I find it persuasive that family and friends testified that the relationship between Jones and the child mirrored a traditional parent-child relationship. The district judge found the testimony of these witnesses particularly persuasive because they witnessed this relationship "in the home at times that were not merely social occasions, but rather in evenings and early mornings." The child's pediatrician echoed these witnesses, testifying that "[i]n the office, both [Jones and Barlow] seemed to take a very active role in [the child's] well-being and be very genuinely interested in how she was doing." Like the district judge, I find this testimony "extremely important."

¶ 90 It is undisputed that Barlow also shared a close mother-daughter relationship with the child. Like the district judge, I believe that Barlow may have had a closer relationship with the child given that she was the biological and nursing mother. I do not believe, however, that Barlow's closer relationship with the child prohibits the child and Jones from also developing an actual parent-child relationship. That the third party is not the child's primary caregiver does not imply that the third party and the child do not share a real parent-child bond. Research has shown that children generally form attachments to both parents at the same age, usually around six to seven months. Kelly & Lamb, *supra* ¶ 88, at 300. This is true even where one parent spends more time with the child than the other, as is the case in the "traditional home." *Id.* Evidence that Barlow was the child's primary caregiver does not defeat a claim of an actual parent-child bond between Jones and the child. Thus, Jones meets the requirement that she formed an actual parental bond with the child.

## IV. THE DE FACTO PARENT DOCTRINE IS CONSTITUTIONAL

¶ 91 Finally, my belief that Jones is a de facto parent and thus entitled to standing is constitutional. The Constitution of the United States, specifically the Due Process Clause of the Fourteenth Amendment, protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). To

protect this fundamental right, parents are entitled to a presumption that a fit parent acts in the best interests of his or her child. *See id.* at 68, 120 S.Ct. 2054 (" 'The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.' " (quoting *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979))). This presumption cannot be rebutted "simply because a state judge believes a 'better' decision could have been made." *Troxel,* 530 U.S. at 73, 120 S.Ct. 2054.

¶ 92 *Troxel* is the preeminent case addressing a parent's fundamental rights in the context of third-party visitation. *Troxel* addressed the application of a Washington statute that allowed " 'any person' " to petition for visitation rights " 'at any time' " and gave a court the authority to grant visitation if it " 'serve[d] the best interest of the child.' " *Id.* at 67, 120 S.Ct. 2054 (quoting Wash. Rev.Code § 26.10.160(3) (1994)). The plurality held that, as applied, the statute violated "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66–67, 120 S.Ct. 2054. According to the plurality, the statute exceeded the bounds of due process because its breadth allowed any third party to bring a visitation petition, and it did not afford a parent's decision any deference despite the parental presumption. *Id.* at 67–68, 120 S.Ct. 2054. Rather, the visitation statute allowed a court to overturn any parent's decision regarding visitation based solely on its determination of the child's best interest, *id.* at 67, 120 S.Ct. 2054, which was precisely

what the district judge in the case had done, *id.* at 68–70, 120 S.Ct. 2054.

¶ 93 However, the de facto parent doctrine does not violate a parent's due process rights under *Troxel.* The de facto parent doctrine is not nearly as broad as the statute at issue in *Troxel.* It does not grant "any" third party standing, but only those persons who have satisfied the stringent requirements of de facto parenthood. Moreover, a finding of de facto parent status does not amount to a judge's determination that a better decision could have been made with regard to visitation, but rather, to a finding that the parental presumption does not apply when a legal parent creates and fosters a parent-child relationship between his or her child and a third party.[12] Also, when a judge makes a determination that a party is a de facto parent, the judge is only determining that the party has standing and is thus entitled to a hearing on the best interests of the child. Thus, the judge's decision that a party is a de facto parent is not a determination of what visitation arrangement is best. *See T.B. v. L.R.M.,* 567 Pa. 222, 786 A.2d 913, 919–20 (2001) ("A determination of standing simply implies that the party has a substantial interest in the subject matter of the litigation and . . . does not speak to [a third party's] chance of success on the merits.").

¶ 94 Moreover, nothing in *Troxel* suggests that the Fourteenth Amendment prohibits third-party visitation in all contexts or always requires a rebuttal of the parental presumption. In fact, the *Troxel* plurality specifically limited its holding to the "sweeping breadth" of the Washington statute, noting that it had not considered whether the Due Process Clause always requires a showing of harm as a prerequisite to third-party visitation. 530 U.S. at 73, 120 S.Ct. 2054. The Court also stated that it was not defining "the precise scope of the parental due process right in the visitation context." [13] *Id.*

12. This case addresses only visitation, and I accordingly limit my analysis regarding a natural parent's waiver of the parental presumption to this context. However, some courts have gone further and recognized parity between de facto and legal parents, thus enabling de facto parents to take advantage of the protections offered by the parental presumption. *See, e.g., Carvin v. Britain (In re Parentage of L.B.),* 155 Wash.2d 679, 122 P.3d 161, 178 (2005) (noting that "the status of *de facto* parents . . . places them in parity with biological and adoptive parents" and gives them a fundamental liberty interest in the care, custody; and management of the child), *cert. denied,* —— U.S. ——, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006).

13. Several of the dissenting justices in *Troxel* indicated that they would not be opposed to granting visitation to those that had a substantial

¶ 95 Therefore, I do not believe that the Due Process Clause is violated under *Troxel* when a judge grants a de facto parent standing in a visitation matter. I recognize that a parent has a right to make decisions regarding the upbringing of his or her child. However, a parent exercises this right when he or she invites a third party to form a parental relationship with his or her child and thereafter actively fosters the relationship. By incorporating the legal parent's intent into our de facto parent test, I am giving deference to the legal parent's decisions. However, once a legal parent exercises this right and creates a de facto parent relationship between the child and another, the legal parent has a reduced expectation of privacy and autonomy. A parent who encourages the formation of such a relationship cannot later unilaterally sever the connection or complain that a court has violated his or her rights by protecting the relationship. As the New Jersey Supreme Court explained in *V.C. v. M.J.B.*:

> [A] parent has the absolute ability to maintain a zone of autonomous privacy for herself and her child. However, if she wishes to maintain that zone of privacy she cannot invite a third party to function as a parent to her child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child.

163 N.J. 200, 748 A.2d 539, 552 (2000), *cert. denied*, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000).

¶ 96 This approach is consistent with post-*Troxel* decisions that have granted third parties standing where the third party has a substantial relationship with the child.[14] For instance, this court determined that Utah's grandparent visitation statute was constitutional and upheld a grant of visitation, against the father's objection, where the maternal grandparents had lived with the child and interacted with her on a daily basis prior to the death of the child's mother. *Uzelac v. Thurgood (In re Estate of S.T.T.)*, 2006 UT 46, ¶¶ 1–4, 144 P.3d 1083. As recognized in *S.T.T.*, when a family is divided by events such as divorce, "a situation may arise where the child's interests differ from those of the parent." *Id.* ¶ 30. The de facto parent test would "provide[ ] guidance to courts in determining whether the petitioning [third party] ha[s] established circumstances under which the courts can, nevertheless, supersede the parent's decision," just as courts may do when the third party seeking visitation is a grandparent. *Id.* ¶ 35. As this court has previously recognized, situations exist in which visitation with a third party may be in the best interests of a child despite the legal parent's objections, and like Utah's grandparent visitation statute, the de facto parent test would, I believe, survive constitutional scrutiny.

relationship with a child. 530 U.S. at 85, 120 S.Ct. 2054 (Stevens, J., dissenting) (noting that in many circumstances it would be "constitutionally permissible for a court to award some visitation of a child to a ... previous caregiver"); *id.* at 98, 100–01, 120 S.Ct. 2054 (Kennedy, J., dissenting) (noting that there may be cases where a third party "has developed a relationship with a child which is not necessarily subject to absolute parental veto" and that "a fit parent's right vis-a-vis a complete stranger is one thing; her right vis-a-vis another parent or a *de facto* parent may be another").

14. *See, e.g., In re E.L.M.C.*, 100 P.3d 546, 557, 562 (Colo.Ct.App.2004) (rejecting the assertion that a parent must be found unfit under *Troxel* and upholding trial court's order granting a partner equal parenting responsibilities based on a psychological parent theory because it was more than a judge's "better decision" as to best interests), *cert. denied*, 2004 WL 2377164, 2004 Colo. LEXIS 851, *cert. denied*, 545 U.S. 1111, 125 S.Ct.

2551, 162 L.Ed.2d 287 (2005); *Rideout v. Riendeau*, 761 A.2d 291, 303 (Me.2000) ("[W]here the grandparents have acted as the children's parents for significant periods of time, [Maine's] Grandparent Visitation Act serves a compelling state interest in addressing the children's relationship with the people who have cared for them as parents ... [and the Act] may be applied ... without violating the constitutional rights of the parents."); *V.C.*, 748 A.2d at 554 (noting that where a parent has invited another to be a de facto parent and thereby "altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained"); *Rubano v. DiCenzo*, 759 A.2d 959, 974 (R.I.2000) (finding that lower court's enforcement of a visitation agreement between the natural parent and the de facto parent did not violate the Due Process Clause because there are circumstances where "even the existence of a developed biological, parent-child relationship ... will not prevent others from acquiring parental rights vis-a-vis the child").

¶ 97 In conclusion, the recognition of de facto parenthood would not infringe upon the general right of parents to raise their children in the manner they deem appropriate. Rather, de facto parenthood addresses only the specific circumstances that arise when a parent consents to and fosters a de facto parent relationship between the parent's child and another party. It merely recognizes that when a parent encourages another to form a de facto parent relationship with a child, the parent and the third party are not the only parties affected by the decision. There is another interested party: the child. In these situations, in order to properly address the best interests of the child, it is appropriate to grant the de facto parent standing.

¶ 98 I therefore conclude that under Utah common law, de facto parents should have standing to seek visitation, despite the objections of a biological or legal parent. De facto parenthood recognizes that when a natural parent fosters such a relationship, the child is also affected and ought to be protected from losing a relationship with someone who is, as far as the child is concerned, a parent.